Sixth Division
December 12, 2008

No. 1-05-3779

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County |
| | ) | |
| v. | ) | |
| | ) | 03 CR 135 |
| GILBERTO GONZALEZ, | ) | |
| | ) | |
| Defendant-Appellee. | ) | Honorable |
| | ) | James B. Linn, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the opinion of the court:

Following a jury trial, defendant, Gilberto Gonzalez, was found guilty of first degree murder and of personally discharging a firearm which proximately caused the death of the victim, Jesse Sandoval. The trial court sentenced defendant to a term of 48 years' imprisonment. On appeal, defendant contends that: (1) he was denied a fair trial because the trial court failed to take any remedial action when it knew that a juror may have fallen asleep during some of the proceeding; (2) the trial court improperly instructed the jury on felony murder based on the predicate offense of aggravated discharge of a firearm; and (3) he was denied a fair trial by improper comments made by the prosecution during closing arguments. For the reasons that follow, we affirm.

Defendant was charged by indictment with the first degree murder of Jesse Sandoval, aggravated discharge of a firearm at Manuel Rayo, and aggravated discharge of a firearm at Eduardo Negrete. The first degree murder charge was brought under three different theories - intentional murder, knowing murder (also called strong probability murder), and felony murder.

See 720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2004). The felony murder theory used aggravated discharge of a firearm as the predicate felony. See 720 ILCS 5/24-1.2(a)(2) (West 2004).

The following evidence was presented at trial.

Jorge Serrano testified that at approximately 7:30 p.m. on December 2, 2002, he was on the northeast corner of 21st Place and Washtenaw Street with Selena Carreto and Amanda Magdaleno. It was dark and snowing at the time, but Serrano could "see everything." because the area was lit by streetlights. Serrano observed a police car traveling the wrong direction on Washtenaw and then observed a tan, four-door Oldsmobile with a window rolled down pull behind the police vehicle and travel in the wrong direction on Washtenaw. Serrano identified defendant as the driver and sole occupant of this vehicle. A couple of minutes later, defendant drove past the group and then Serrano saw the victim cross the street to the south side of 21st Place and walk between two parked vans. Defendant stopped his vehicle on the corner of 21st Place and Washtenaw Street and waited. When the victim "glanced out" from between the vans, defendant "started unloading his weapon" and, according to Serrano, fired approximately 10 shots at the victim. Defendant then drove away and Serrano chased after him until he reached Cermak Street, where he flagged down a police vehicle and pointed out defendant's vehicle to the officers. Approximately 20 minutes later, the police brought defendant back to the area and Serrano identified him as the shooter.

Manuel Rayo testified that he and Eduardo Negrete were walking south on Washtenaw Street at approximately 7:20 on the evening of the murder. Rayo also observed defendant follow the northbound police vehicle and testified that he noticed the vehicle because it's window was

2

rolled down even though it was snowing at the time. Shortly thereafter, as he and Negrete were walking east on 21st Place, Rayo again saw defendant, who was the sole occupant of the tan vehicle, driving west on 21st Place in the direction of Washtenaw. When defendant turned left onto Washtenaw, Rayo heard gunshots and, although he did not see the face of the person who fired the weapon, he saw sparks coming from the driver's side window of the tan vehicle. Rayo testified that he "hit the floor" because the gunshots were fired in both his and the victim's direction. When he got up, Rayo saw the victim lying on the ground. Rayo identified defendant as the shooter to the police.

Eduardo Negrete testified to substantially the same sequence of events as did Rayo. Negrete was able to see the face of the person who fired the weapon from the tan vehicle and identified defendant as the shooter. Negrete testified that defendant initially fired three shots in another direction and then fired approximately four shots in the direction of the area where he, Rayo and the victim were standing. Negrete further testified that he, Rayo and the victim were all in defendant's "line of fire," and he believed that defendant was shooting at each of them. When the shots were fired, Negrete hid behind a tree and saw the victim "go down." The following day, Negrete identified defendant in a lineup at the police station as the person who shot the victim.

Amanda Magdaleno testified to substantially the same sequence of events as did Serrano. Magdaleno testified that she was not able to see who was driving the tan vehicle that was following the police car north because there was snow on the vehicle. Magdaleno was standing on the northeast corner of 21st Place and Wasthenaw with Selena Carreto, Serrano and the victim when she again saw the tan vehicle driving on 21st Place toward Wasthenaw. That vehicle began

to turn left onto Washtenaw and the victim crossed the street behind it and tried to hide between two parked vans on the south side of 21st Place. Magdaleno was unable to see who was in the tan vehicle but saw at least five gunshots being fired from the vehicle's open driver's side window. Magdaleno and Carreto then ran to Carreto's nearby home, looked out the window, and saw the victim lying on the ground. She was subsequently taken to a nearby alley by the police, where she saw that the tan vehicle had struck a telephone poll. She identified it as the same vehicle from which the shots were fired.

Selena Carreto testified to substantially the same sequence of events as did Magdaleno. She also could not see who was driving the tan vehicle the first time it passed the group because of the snow and, although she heard the gunshots and saw "light" after the vehicle passed by the second time, she did not see the face of the person who fired the shots because her vision was blocked by a building.

Dr. John Scott Denton, a forensic pathologist and the deputy medical examiner at the Cook County medical examiner's office, performed an autopsy on the victim. Dr. Denton testified that in his opinion, to a reasonable degree of medical and scientific certainty, the victim died of a gunshot wound to the back and the cause of death was homicide.

Chicago police officer David Williams was on patrol with his partner at approximately 7:30 p.m. on December 2, 2002, when he observed a tan Oldsmobile traveling south on Washtenaw Street and then turn west onto Cermak. Officer Williams testified that he noticed the car because it was snowing outside and the car was covered in snow except for the driver's side window. As Officer Williams approached a stoplight, he was flagged down by Jorge Serrano,

4

who pointed to the tan vehicle and said, "[t]hat guy in that car just shot my friend." Officer Williams then turned on his vehicle's emergency lights and the tan vehicle, which was stopped ahead at the red light, turned and "took off." Officer Williams chased the vehicle at a "high speed" until it turned into an alley, where the driver exited the moving vehicle. At that time, Officer Williams observed a blue steel handgun in the driver's left hand. He identified defendant as the driver of the vehicle.

Officer Williams then exited his vehicle, drew his weapon, and ordered defendant to drop the weapon. When defendant threw his weapon to the ground and "took off," Officer Williams pursued him on foot while his partner remained in the alley with the car and the gun. Officer Williams eventually encountered defendant behind a house, drew his weapon, identified himself as the police, and ordered defendant to stop. Defendant paused momentarily and then jumped over a fence. Officer Williams grabbed defendant but was unable to hold onto him. At that point, Officer Williams was met by Officers Bocanegra and Huges

Chicago police officer Marcos Bocanegra testified that he and his partner, Officer Huges, met Officer Williams behind the house and received a description of the suspect. Officer Bocanegra observed footsteps in the snow and followed them to a storage area underneath a stairwell at a nearby building, where he saw a door that had been kicked in and a lock that was on the ground. The officer followed the footsteps inside the storage area and found defendant hiding behind a door. Office Williams later identified defendant as the person he had chased on foot through the alley.

Forensic investigator Peter Larcher of the Chicago police department processed the crime

scene where the victim was shot. He found a .40-caliber cartridge case in the snow on Washtenaw and a fired bullet to the east of the cartridge case on 21st Place. Larcher also observed two nearby vans that were damaged by gunfire. Larcher processed the alley where defendant exited his vehicle and, in a gangway just off of that alley, found a .40-caliber semi-automatic pistol. Larcher then went to the police station at approximately 10:30 p.m. on the night of the murder and performed a gunshot residue test on defendant.

Linda Engstrom, who was a forensic scientist and latent print examiner with the Illinois State Police Forensic Science Center at the time of the murder, testified that she examined the cartridge case and the weapon and found no latent prints suitable for comparison.

Brian Parr, a forensic scientist with the Illinois State Police, testified that he was unable to find a sufficient pattern to make an identification of the fired bullet. However, he was also not able to make an elimination that would allow him to conclude that the bullet had not been fired from the recovered .40-caliber handgun. Parr examined the cartridge case and testified that in his opinion, within a reasonable degree of scientific certainty, it was fired from the .40-caliber weapon.

Scott Rochowicz, a forensic scientist specializing in microscopy and trace chemistry with the Illinois State Police Forensic Science Center, testified that the gunshot reside test produced particles that were consistent with gunshot residue and one particle from defendant's right hand that was unique to gunshot residue. In Rochowicz's opinion, within a reasonable degree of scientific certainty, defendant may have discharged a firearm, may have contacted a gunshot residue particle, or may have received particles from an environmental source. This result is

considered "consistent" with defendant having been in contact with a gun as it was fired, although it is not a "positive" or "negative" result. Rochowicz explained that a positive result allows for the conclusion that the test subject did discharge a firearm or was in close proximity to a firearm when it was discharged, and a negative result allows for the conclusion that the subject may not have discharged a firearm, although, in this situation, it is possible that the gunshot residue particles were not deposited on the subject's hands or were removed or undetected.

Detective Patrick Denahan was assigned to investigate the victim's death. Detective Denahan conducted a lineup on December 3, 2002, during which Negrete identified defendant. Negrete also told the detective that when the tan car passed by the first time, he was able to see the driver and positively identified that person as defendant.

The jury found defendant guilty of first degree murder and of having personally discharged a firearm that proximately caused the victim's death (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006)), but not guilty of aggravated discharge of a firearm as to both Rayo and Negrete. The trial court sentenced defendant to a term of 48 years' imprisonment. This appeal followed.

Defendant first contends that he was denied a fair trial because the trial court failed to take any remedial action when it knew that a juror had slept through a portion of the trial.

The record shows that, at the conclusion of the first day of trial, after Rayo's testimony had concluded and the jury had been dismissed, the following exchange occurred:

"THE COURT: Now, the next thing I want to bring up, the

Court called a sidebar off the record, but I indicated it appeared to

me from my observations that one of the jurors, Terri Stark, may

7

have fallen asleep during some of the proceedings. I told the lawyers to be aware of my observation, and you could make your own observations as well, and you can consider. If everybody believes that my observation is correct, whether a remedy would be required.

I'm not sure what everybody else saw and I think the sidebar may have awakened her, at least somewhat.

Let's just say that I saw that, and we can think about that.

MR. PRUSAK [Defense Counsel]: Can we sleep on it?

THE COURT: Yes, you can sleep on it. Sarcasm is noted. Did people see what I saw?

MR. PRUSAK: Yes, she was definitely out for awhile.

THE COURT: The very dark complexioned, albeit Caucasian, a little on the plump side.

MR. GROTH [Assistant State's Attorney]: Hey, it's ok.

THE COURT: But I was concerned about that, and that's why we have alternates. It is one of the reasons we have alternates. I am not going to sua sponde [*sic*] do anything about it now, but the situation is as it was. If the lawyers want to make motions, we'll consider them. You don't have to make a motion now. You can think about it until later."

No further mention of this issue or the juror in question was made throughout the remainder of trial.

Defendant now claims that the trial court should have questioned the juror about her attentiveness during trial or removed her and substituted an alternate in her place. Defendant argues that, by failing to do so, the juror was allowed to deliberate and decide his guilt without having heard all of the evidence.

We initially find that defendant has waived this claim because he failed to raise an objection to the juror during trial or include this issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (failure to raise objection at trial and include the objection in a posttrial motion results in waiver of that issue on appeal). Defendant acknowledges that defense counsel did not ask the court to remove the juror or include this issue in a posttrial motion, but asks that we nevertheless review the claim under the plain error rule.

The plain error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error where either the evidence is close, or the error affects substantial rights. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). In the first instance, defendant must prove "prejudicial error," *i.e.*, that there was error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *Herron*, 215 Ill. 2d at 187. Alternatively, under the second prong of the plain error analysis, defendant must prove there was error and that the error was so serious that it affected the fairness of his proceeding and challenged the integrity of the judicial process. *Herron*, 215 Ill. 2d at 187. In both instances, the burden of persuasion remains on the defendant. *Herron*, 215 Ill. 2d at 187, citing *People v.*

9

*Hopp*, 209 Ill. 2d 1, 12 (2004).

In this case, the evidence of defendant's guilt was not closely balanced. The eyewitness testimony established that defendant drove past the area where the victim was standing and then returned to that area several minutes later and fired numerous shots in the direction of the victim, Rayo, and Negrete. Officer Williams testified that he pursued defendant in his vehicle to an alley, where defendant exited his vehicle and threw a gun to the ground. Defendant then fled from Officer Williams on foot and was eventually found by Officer Bocanegra hiding in a storage area in a nearby building. A cartridge case and bullet were found at the scene of the shooting, and the forensic testimony established that the cartridge case was fired from the handgun recovered in the alley. The gunshot residue test performed on defendant produced particles that were consistent with gunshot reside and forensic scientist Rochowicz testified that defendant may have discharged a firearm, may have contacted a gunshot residue particle, or may have received particles from an environmental source. This evidence of defendant's guilt was overwhelming.

Because the evidence of defendant's guilt was not closely balanced, we review defendant's claim pursuant to the second prong of the plain error doctrine, under which defendant must prove that there was plain error and that the error was so serious that it affected the fairness of his proceeding and challenged the integrity of the judicial process. *Herron*, 215 Ill. 2d at 187.

"When faced with possible juror misconduct, it is within the sound discretion of the trial court whether to reopen *voir dire*, and we review the trial court's actions for an abuse of that discretion." *People v. Jones*, 369 Ill. App. 3d 452, 455 (2006).

Defendant relies principally on our recent decision in *Jones* to argue that the trial court

10

failed to fulfill its affirmative duty to ensure that he had an attentive jury.

In *Jones*, 369 Ill. App. 3d at 453, after the State had rested its case and outside the presence of the jury, the trial court informed the parties that one of the jurors was " 'half asleep during almost the entire proceeding.' " After discussing the issue with the parties, the court denied defendant's motion for a directed verdict and the defense rested. *Jones*, 369 Ill. App. 3d at 454. On appeal, the defendant argued that he was denied a fair trial because the juror had " 'slept through the trial' " and neither the trial court nor his trial counsel took remedial action. *Jones*, 369 Ill. App. 3d at 454. In responding to the State's claim of waiver, we noted that the evidence of defendant's guilt was not closely balanced and therefore we reviewed the issue under the second prong of the plain error doctrine, noting that if there was error, "[p]rejudice to the defendant [was] presumed because of the importance of the right involved, 'regardless of the strength of the evidence [supporting the defendant's guilt].' " (Emphasis omitted.) *Jones*, 369 Ill. App. 3d at 455, quoting *Herron*, 215 Ill. 2d at 187.

In addressing whether the trial court had an affirmative duty to ensure an attentive jury, we noted that, although there was no Illinois cases on the issue, the case law did establish that a juror who is inattentive for a substantial portion of a trial has been found to be unqualified to serve on the jury. *Jones*, 369 Ill. App. 3d at 455 (collecting cases). We held that, under the facts of that case, where the trial court stated on the record that a juror appeared to the judge to have been half asleep through most of the trial, "the trial court, on its own motion, must make further inquiry to ensure that the defendant receives a fair trial." *Jones*, 369 Ill. App. 3d at 456. We rejected the State's argument that, pursuant to *United States v. Tierney*, 947 F.2d 854 (8th Cir.

11

1991), the defendant must establish that a juror failed to follow some important or essential part of the trial. We noted that the court in *Tierney* specifically stated that the defendant did not show that the challenged jurors " '*ignored any particularly important items*,' " and that the defendant made a general assertion that some jurors " 'slept through *parts* of' " the trial. (Emphasis in original.) *Jones*, 369 Ill. App. 3d at 456, quoting *Tierney*, 947 F.2d at 868-69. We further noted that, in the present case, it was the judge who observed that the juror was "'half asleep during *almost the entire* proceeding'" and that we saw "no point to a rule that would compel the defendant to repeat what was already known by the court." (Emphasis in original.) *Jones*, 369 Ill. App. 3d at 456. Accordingly, we found that, given the possibility of a juror having slept through "almost the entire proceeding," the trial court abused its discretion by failing to reopen *voir dire*. *Jones*, 369 Ill. App. 3d at 456.

Defendant claims that the present is similar to *Jones* and that the trial court therefore had an affirmative duty to open *voir dire* and question the juror. However, after carefully reviewing the record, we do not believe that the facts of the present case are analogous to the situation we considered in *Jones*.

The record in this case indicates that when the discussion among the parties regarding the juror in question occurred at the end of the first day of trial, the trial judge indicated that he had previously called a sidebar based upon his observations of the juror and told the parties to make their own observations as well. Our review of the record establishes that the there were two off-the-record sidebars prior to the court's discussion with the parties: one at the conclusion of Serrano's testimony and another at the beginning of defense counsel's cross-examination of Rayo.

12

1-05-3779

Prior to the first sidebar, Rosa Torres and Jorge Serrano had testified and, prior to the second sidebar, Manuel Rayo had also testified on direct examination. Both of these sidebars appear to have occurred late in the afternoon and near the end of the first day of trial. After the second sidebar, defense counsel cross-examined Rayo and then, at the end of that day's proceedings, the trial court had the on-the-record discussion with the attorneys regarding the juror. The following day, 11 additional witnesses testified, including Eduardo Negrete, Amanda Magdalenom, Selena Carreto, Officers Williams and Bocanegra, and all of the State's forensic experts.

In considering whether the trial court abused its discretion, we initially note that, under the plain error rule, it is defendant's burden to establish that there was error and that the error was of such a magnitude that it denied defendant a fair trial and challenged the integrity of the judicial process. *Herron*, 215 Ill. 2d at 187. Moreover, courts have taken the view that the party claiming error from an inattentive or sleeping juror must demonstrate that the juror "failed to follow some important or essential part of the proceeding." *Tierney*, 947 F.2d at 868, quoting A. Barnett, *Inattention of Juror from Sleepiness or Other Cause as Ground for Reversal or New Trial*, 88 A.L.R.2d 1275, 1278-79 (1963). For the reasons that follow, we find that defendant has failed to meet this burden.

Contrary to defendant's argument, we believe that the trial judge in this case took precisely the type of action that we faulted the trial judge in *Jones* for failing to take. The focus of our decision in *Jones* was on the trial judge's failure to take any action throughout the trial despite the judge's awareness that the juror was " 'half asleep during *almost the entire proceeding*.' " (Emphasis in original.) *Jones*, 369 Ill. App. 3d at 456. Under those

13

circumstances, we found that the trial court had an affirmative duty to ensure that the defendant received a fair trial and that the court abused its discretion by failing to reopen *voir dire*. In this case, the record indicates that during an early part of the proceedings, the trial judge noticed that one of the jurors "*may have fallen asleep* during some of the proceedings" and immediately brought the matter to the parties' attention. (Emphasis added.) The trial judge told the parties to be aware of his observation regarding the juror and that the court would consider any motions made by the parties. Defense counsel, however, did not file a motion or ask the court to reopen *voir dire*. Thus, the present case does not present a situation where, as in *Jones*, the trial judge noticed that a juror had been sleeping throughout the proceedings but did not bring the matter to the parties' attention until the conclusion of trial. Rather, given that the trial court became aware of and alerted the parties to the problem relatively early during trial, we believe the trial court fulfilled its affirmative duty to ensure that defendant received a fair trial.

Our conclusion that defendant was not denied a fair trial by the trial court's action is supported by the fact that we cannot say, and defendant has failed to show, that the juror "may have fallen asleep" for a substantial portion of trial or that the juror failed to follow an essential part of the proceedings. See *Jones*, 369 Ill. App. 3d at 455 (collecting cases and noting that a juror who is inattentive for a substantial portion of a trial has been found to be unqualified to serve on the jury). The record indicates that prior to the initial off-the-record sidebar, Torres, the victim's mother, testified that her son was alive on November 28, 2002, and that he son was deceased when she next saw him at the hospital on December 2, 2002. Her testimony was therefore immaterial to the issue of defendant's guilt. Serrano also testified during this portion of

14

the trial and provided eyewitness testimony that defendant drove past the area where the victim was standing and that he returned shortly thereafter, at which point he fired approximately 10 shots at the victim. At the conclusion of Serrano's testimony, the initial off-the-record sidebar took place. Rayo then testified on direct examination that he saw defendant drive past where the victim was standing and that he saw defendant return to that location shortly thereafter. Rayo also testified that he saw sparks coming from the window of the car defendant was driving, but that he did not see who fired the shots. After defense counsel began to cross-examine Rayo, the trial court called the second off-the-record sidebar. Defense counsel then finished his cross-examination of Rayo, during which time Rayo reiterated his testimony that he saw defendant twice drive past the victim and that he saw sparks coming from the window of the car that defendant was driving. The on-the-record discussion regarding the juror then took place. Given the trial court's remark that the juror "may have fallen asleep" during some of these proceedings, it is unclear what, if any, portion of Serrano or Rayo's testimony the juror missed. However, the trial court clearly considered the issue and decided that it was sufficient at the time to alert the parties and that an alternate juror was not required. We cannot say that this constituted an abuse of discretion. See *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987) ("[t]he court had discretion to resolve the problem of the sleeping juror. It considered carefully the testimony missed during the nap and found that it was insubstantial. We find no abuse of discretion in the method used to remedy the situation").

We believe that it is reasonable to presume that after the trial court called the matter to the parties' attention, the attorneys as well as the trial judge would have paid particular attention to

15

the juror in question and therefore noticed had this juror again appeared to have fallen asleep. No further mention was made of the juror in question and, in fact, defendant does not now argue that the juror was or "may have been" asleep at any further point during the trial. Therefore, based upon this record, we presume that after the trial court brought the matter to the parties' attention, the juror remained awake and attentive for the remainder of the trial.

In light of that presumption, the juror was attentive at least during the testimony of the 11 additional witnesses who were called after the second sidebar. Significantly, this included Negrete's positive eyewitness identification of defendant as the person who twice drove past the area where the victim was standing and who, on the second occasion, fired approximately four shots at the victim. This portion of the trial also included Magdaleno and Carreto's testimony, which corroborated that the tan vehicle drove past the area twice and that shots came from that vehicle, as well as Officer William's testimony regarding his pursuit of defendant and defendant dropping the weapon and Officer Bocanegra's testimony that he found defendant hiding in the storage area. Finally, we presume that the juror was awake and attentive for the testimony of the State's forensic expert witnesses, which most importantly established that the shell casing found at the scene of the crime was fired from the weapon that Officer Williams saw defendant drop in the alley. This evidence was more than sufficient to prove defendant guilty beyond a reasonable doubt, and we therefore cannot say that the juror was asleep for a substantial portion of the trial. See *United States v. Diaz*, 176 F.3d 52, 78 (2nd Cir. 1999) (finding no harm where juror "perhaps had slept for a very brief moment, [but] was generally alert and attentive to the evidence"); *Tierney*, 947 F.2d at 868-69 ("Defendant has not shown that the jury ignored any particularly

important items. Instead, he has relied on a general assertion that jurors slept through parts of 'the critical presentation of [defendant's] evidence and the cross-examination of witnesses for the prosecution.' Such assertions are too vague to establish prejudice").

Additional factors further support our conclusion that defendant has not established, and the record does not indicate, that the juror was asleep for substantial portions of the trial such that defendant was denied a fair trial or that any possible error challenged the integrity of the judicial process. For example, we believe that the jury's unanimous verdict of not guilty on the charges of aggravated discharge of a firearm as to Rayo and Negrete suggests that the juror was attentive for all material portions of the trial and was able to perform her duties. See *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000) (holding that a sleeping juror should be removed from the jury if his sleep either makes it impossible to perform his duties or would otherwise deny the defendant a fair trial). Additionally, we question whether defendant was denied a fair trial by the fact that the juror "may have fallen asleep" during Serrano's positive and credible eyewitness testimony that defendant shot and killed the victim. See *Samad v. United States*, 812 A.2d 226, 231 (D.C. App. 2002) (finding that the defendant was not prejudiced where a juror allegedly slept through "important parts of the government's case" (emphasis omitted), and noting that this was "prejudicial to the government ***, for the testimony *** supported the prosecution and disfavored the defense").

Ultimately, we are left with a record that indicates that a juror "may have fallen asleep" during the early portion of defendant's trial, during which time two or three witnesses testified. Upon noticing the issue, the court immediately brought it to the parties' attention and there is

17

nothing in the record to suggest that the problem arose again or that the juror was inattentive during the testimony of the State's 11 remaining witnesses, whose testimony was more than sufficient to establish defendant's guilt. Defendant does not point to any significant testimony that the juror missed, not does he argue that counsel should have filed any particular motion in response to the issue. Based upon this record, we cannot say, and defendant has not met his burden to demonstrate, that the trial court's response to the issue was an abuse of discretion or that an error occurred which was so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *Herron*, 215 Ill. 2d at 187. Accordingly, defendant's claim does not rise to the level of plain error and we find that it is waived.

Defendant next contends that the trial court improperly instructed the jury that it could find him guilty of first degree murder based on the predicate felony of aggravated discharge of a firearm.

We find that defendant has waived this claim because he did not object to the jury instructions during trial or raise this issue in a posttrial motion. See *Enoch*, 122 Ill. 2d at 186. In this case, the jury instructions were given by agreement of both the State and defendant and each party voiced its agreement with the court's statement that the agreed-upon jury instructions were in "good form." In this respect, our supreme court has noted that it is defendant's obligation to object to a particular instruction as well as his duty to tender a proper instruction on a particular issue at trial and that the failure to do so precludes defendant from raising on appeal an objection to the instructions that were given to the jury. See *People v. Smith*, 71 Ill. 2d 95, 104 (1978).

Defendant acknowledges that this contention is waived but, once again, asks that we

review the issue under the plain error rule. However, before invoking the plain error exception, " 'it is appropriate to determine whether error occurred at all,' because without error, there can be no plain error." *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007), quoting *People v. Wade*, 131 Ill. 2d 370, 376 (1989). Therefore, we must first determine whether the jury was improperly instructed with respect to the charge of first degree murder based on the predicate felony of aggravated discharge of a firearm.

In *People v. Morgan*, 197 Ill. 2d 404, 447 (2001), the case upon which defendant principally relies, the supreme court held that "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." In other words, according to the court, the predicate offense must involve conduct with a felonious purpose other than the killing itself. *Morgan*, 197 Ill. 2d at 458. The defendant in *Morgan* shot his grandfather during a confrontation and shot his grandmother in the back as she was fleeing her home. He was charged with and subsequently convicted of, among other things, felony murder predicated on both aggravated battery and aggravated discharge of a firearm. In arriving at its holding, the court expressed concern that every shooting necessarily encompassed conduct constituting aggravated battery, *i.e.*, great bodily harm, as well as conduct constituting aggravated discharge of a firearm, *i.e.*, discharging a firearm in the direction of another. *Morgan*, 197 Ill. 2d at 447. Under those circumstances, the court reasoned that all fatal shootings could be charged as felony murder based upon aggravated battery and/or aggravated discharge of a firearm and that the result could be to effectively eliminate the second degree murder statute and also to eliminate the need for the State to prove an intentional or

19

knowing killing in most murder cases. *Morgan*, 197 Ill. 2d at 447. The court ultimately determined that because the predicate felonies of aggravated battery and aggravated discharge of a firearm in that case "arose from and were inherent in" the murders of the defendant's grandparents, the jury should not have been instructed that the defendant could be convicted of first degree murder under a felony-murder theory. *Morgan*, 197 Ill. 2d at 447-48.

However, based upon the principle articulated in *Morgan*, this court has found that there is no error in instructing the jury on felony murder where the predicate offense of aggravated discharge of a firearm involved a victim other than the murder victim. See *People v. Ruiz*, 342 Ill. App. 3d 750, 756 (2003) (finding that, where the murder victim was shot and killed while holding his son, the jury was properly instructed on felony murder with respect to the murder victim based upon the predicate offense of aggravated discharge of a firearm at the murder victim's son); see also *People v. Figueroa*, 381 Ill. App. 3d 828, 836-37 (2008); *People v. McGee*, 345 Ill. App. 3d 693, 699 (2003); *People v. Toney*, 337 Ill. App. 3d 122, 135-36 (2003).

In this case, defendant was charged with the felony murder of Jesse Sandoval based upon the predicate offense of aggravated discharge of a firearm as to either Manuel Rayo or Eduardo Negrete. The evidence presented at trial established that Rayo and Negrete were standing on the same side of the street as Sandoval when defendant began shooting. Rayo testified that the shots were fired in both his and Sandoval's direction, and that he fell to the ground in order to protect himself from being shot. Negrete testified that defendant fired four shots in the direction of where he, Rayo and Sandoval were standing and that he hid behind a tree because he believed defendant was shooting at each of them. Under these circumstances, the acts constituting the forcible felony

20

of aggravated discharge of a firearm were not inherent in the act of murder itself but, rather, involved conduct with a felonious purpose other than the killing of Jesse Sandoval. That conduct involved the separate felonious purpose of discharging a firearm at Negrete and Rayo. See *Ruiz*, 342 Ill. App. 3d at 756. Therefore, as in *Ruiz*, we find that the jury was properly instructed on felony murder where the predicate felony of aggravated discharge of a firearm involved a victim other than the deceased.

Defendant does not dispute that, in this case, the felony murder charge could properly be based on the predicate felony of aggravated discharge of a firearm as to either Negrete or Rayo because those predicate offenses involved a victim other than the deceased. As defendant acknowledges in his brief before this court, "the court could have properly instructed the jury that they could find [him] guilty of felony murder based on the predicate felonies of aggravated discharge of a firearm as to either Rayo or Negrete." Defendant claims that the jury was not properly instructed, however, because the felony murder instruction did not specify that aggravated discharge of a firearm could be the basis for finding him guilty of felony murder only where the victim was either Negrete or Rayo. Without this language, defendant argues, the jury was left with the impression that if it found that defendant committed aggravated discharge of a firearm based on his shooting of *any* person, including Jesse Sandoval, he was guilty of felony murder.

Defendant specifically complains of the following instruction given to the jury with respect to the charge of first degree murder:

"To sustain the charge of first degree murder, the State

21

must prove the following propositions: First, that the defendant performed the acts which caused the death of Jesse Sandoval; and second, that when the defendant did so, he intended to kill or do great bodily harm to Jesse Sandoval or another; or he knew that his acts would cause death to Jesse Sandoval or another; or he knew that his acts created a strong probability of death or great bodily harm to Jesse Sandoval or another; or he was committing the offense of aggravated discharge of a firearm."

We find that defendant's argument is without merit because it is based solely upon a reading of the first degree murder instruction in isolation. Jury instructions, however, should not be viewed in isolation but, rather, should be construed as a whole to determine whether they fairly, fully and comprehensively informed the jury of the relevant law. *People v. Watson*, 342 Ill. App. 3d 1089, 1097 (2003), citing *Leonardi v. Loyola University of Chicago,* 168 Ill. 2d 83, 100 (1995); *People v. Ward,* 187 Ill. 2d 249, 265 (1999). Our supreme court has recognized that to " 'require absolute and technical accuracy in instructions would, as a general rule, defeat the ends of justice and bring the administration of the criminal law into disrepute and contempt. It is sufficient when instructions, considered as a whole, substantially and fairly present the law of the case to the jury.' " *People v. Bannister*, No. 100983, slip op. at 27 (October 17, 2008), quoting *People v. Banks*, 7 Ill. 2d 119, 129 (1955). When reviewing jury instructions, the standard of review is whether the trial court abused its discretion, which occurs if the instructions are not sufficiently clear to avoid misleading the jury. *People v. Mohr*, 228 Ill. 2d 53, 66 (2008).

In this case, in addition to the challenged first degree murder instruction, the trial court gave the jury two specific instructions regarding the charges of aggravated discharge of a firearm. The first instruction informed the jury that to sustain the charge of aggravated discharge of a firearm, the State was required to prove that defendant knowingly discharged a firearm and that he "discharged the firearm in the direction of Manuel Rayo." The second instruction informed the jury that to sustain the charge of aggravated discharge of a firearm, the State was required to prove that defendant knowingly discharged a firearm and that he "discharged the firearm in the direction of Eduardo Negrete." In addition, the trial court informed the jury that defendant was charged with the offenses of "first degree murder of Jesse Sandoval, aggravated discharge of a firearm of Manuel Rayo and aggravated discharge of a firearm of Eduardo Negrete."

Therefore, although the first degree murder instruction informed the jury that the State was required to prove that defendant was committing the offense of aggravated discharge of a firearm, without specifically mentioning that the victims of that offense must have been either Negrete or Rayo, the only instructions given to the jury regarding aggravated discharge specifically stated that Negrete and Rayo were the potential victims of that offense. Additionally, the jury was not given an instruction of aggravated discharge of a firearm with respect to the murder victim, Jesse Sandoval, because the State did not charge or prosecute defendant under that theory. Thus, when the jury instructions are viewed in their entirety, we believe the jury was properly informed that it could find defendant guilty of first degree murder based on felony murder only if it found defendant guilty of aggravated discharge of a firearm as to either Negrete or Rayo. Accordingly, we find that the jury was properly instructed on the charge of felony

23

murder based on the predicate felony of aggravated discharge of a firearm and that the trial court did not abuse its discretion.

Moreover, even if we were to assume that instructing the jury on felony murder was error because the instruction did not specifically list Negrete and Rayo as the victims, the general verdict returned by the jury renders any error in the instruction harmless.

In this case, the State prosecuted the first degree murder charge under the theories of intentional murder, knowing murder (also called strong probability murder), and felony murder. The State also prosecuted defendant for aggravated discharge of a firearm at Negrete and Rayo. The jury returned a general verdict of guilty on the charge of first degree murder and a verdict of not guilty on the charges of aggravated discharge of a firearm. It is well settled that where an indictment contains several counts arising out of a single event, and a general verdict is returned, the effect is defendant is guilty as charged in each count. *Morgan*, 197 Ill. 2d at 448; *Ruiz*, 342 Ill. App. 3d at 756. Therefore, the general verdict returned in this case means that the jury found defendant guilty of both intentional murder and murder by creating a strong probability of death or great bodily harm. *Morgan*, 197 Ill. 2d at 448 ("a general verdict finding a defendant guilty of murder, where the defendant was charged with intentional, knowing, and felony murder, raises the presumption that the jury found the defendant committed the most serious crime alleged, intentional murder"). In fact, the trial court entered judgment on count 17 of the indictment, intentional or knowing murder, and we believe that the evidence presented at trial was sufficient to sustain defendant's conviction for either intentional and knowing murder or murder by creating a strong probability of death or great bodily harm.

1-05-3779

Defendant nevertheless argues that we should disregard the presumption in this case. Defendant initially claims that in *Ruiz*, this court agreed that *Morgan* dictated a factual analysis before applying the presumption. We disagree with this statement. In *Ruiz*, we did not suggest that a court should engage in a factual analysis before applying the presumption but, rather, after applying the presumption, we stated, "[a]lthough it may well be that a reviewing court can and possibly should 'disregard the presumption' raised by a general verdict, the facts here compel no such result." *Ruiz*, 342 Ill. App. 3d at 757.

Likewise, the facts of this case do not compel us to disregard the presumption. Defendant claims that we should do so because the jury found him not guilty of aggravated discharge of a firearm as to Rayo and Negrete and therefore implicitly found that he discharged a firearm in the direction of Jesse Sandoval. Accordingly, defendant claims that it is possible that the jury relied on aggravated discharge of a firearm to find him guilty of felony murder. Defendant also claims that the risk of error is great in this case because the felony murder count was singled out by the court in its instructions and by the prosecutor in his closing arguments. We disagree.

As we have already held, the jury instructions in their entirety informed the jury that the charge of felony murder was based on the predicate felony of aggravated discharge of a firearm as to either Negrete or Rayo. Therefore, the fact that the jury returned a not guilty verdict on those two charges indicates that it did not find defendant guilty of first degree murder based on a theory of felony murder. Moreover, the record shows that the trial court instructed the jury on all three theories for the charge of first degree murder and that the court did not emphasize the felony murder theory.

25

As to defendant's claim that the prosecutor emphasized the felony murder theory in closing arguments, we note that the prosecutor explained the felony murder charge to the jury as follows:

"Let's look at that fourth proposition. The fourth alternative in the second proposition. W have to prove the first alternative that the defendant performed the acts which caused the death of Jesse Sandoval, and that when the defendant did so, the fourth alternative simply says he was committing the offense of aggravated discharge of a firearm.

It's very important to notice that that [*sic*] fourth alternative of the second proposition doesn't refer to what we call the State of mind. It doesn't refer to his intent, or his knowledge, that's commonly known as the law of felony murder. And that's because the law recognizes that when you commit a felony like aggravated discharge of a firearm, the likelihood is so great of someone getting killed that it doesn't matter if you intended to kill or do great bodily harm or you knew you were going to kill him or do great bodily harm.

All that's required is that you find that this defendant is guilty of committing aggravated discharge of a firearm and during that offense, Jesse Sandoval was killed, then this defendant is guilty

26

of first degree murder. That's how the law works. And that case

as I've already mentioned the fourth alternative is clearly proven."

Defendant claims that this argument emphasized to the jury that the State only had to prove that he fired a weapon in the direction of Jesse Sandoval in order to find him guilty under the felony murder count.

However, although not cited to by defendant, the record shows that immediately after telling the jury that the fourth alternative had been proven, the prosecutor stated:

"You've heard the evidence that the defendant fired the gun

in the direction of Eduardo [Negrete] and Manuel Rayo and during

that aggravated discharge Jesse Sandoval was killed."

Thus, when the challenged argument is viewed in its entirety, it is clear that the prosecutor did not mislead the jury by stating that it had to find only that defendant discharged a weapon in the victim's direction but, rather, told the jury that defendant was guilty of the felony murder count if it found that defendant fired his weapon in the direction of Negrete or Rayo. Accordingly, we find nothing improper in the prosecutor's explanation of the felony murder charge.

Likewise, we disagree with defendant that, by giving the jury the above explanation, the prosecutor emphasized and urged the jury to convict defendant of felony murder. Prior to explaining the felony murder count, the prosecutor spent significant time reviewing the theories of intentional and knowing murder and murder by creating a strong probability of death or great bodily harm, and urged the jury to convict defendant under these theories as well. Specifically, after explaining the elements of these two theories of first degree murder, the prosecutor argued:

"Ladies and gentlemen, it's clear in this case, when you hold

a gun and you point that gun in [*sic*] another person and you pull

the trigger and you fire it five to 8 times, you're intending to kill or

for great bodily harm you know your acts will cause death and you

know your acts will have a great, a strong probability of causing

death or great bodily harm.

And as I have already mentioned, this defendant came back

and that speaks volumes about his intent. All of the first three

alternatives form the second proposition of the murder instruction

have been proven."

Therefore, in light of the above, we find no merit to defendant's argument that we should

disregard the presumption because the prosecutor urged the jury to convict defendant of first

degree murder under the felony murder count.

Defendant further argues that there was a risk the jury found him guilty under the felony

murder theory because the State failed to elicit a motive for the killing. However, motive is not

an essential element of murder and the State is not required to prove it in order to sustain a

murder conviction. *People v. Carson*, 238 Ill. App. 3d 457, 464 (1992). Moreover, the evidence

in this case was not merely circumstantial. See *People v. Whalen*, 238 Ill. App. 3d 994, 1002

(1992) (noting that while motive is not an element of murder, it may be a material factor in

establishing guilt when the only evidence is circumstantial). Rather, there was eyewitness

testimony establishing that defendant drove by the area where the victim was standing and then

returned to that area shortly thereafter, at which point he shot and killed the victim. Accordingly, we find defendant's argument without merit.

Finally, defendant argues that the "one good count" doctrine conflicts with the United States Supreme Court's holdings in *Stromberg v. California*, 283 U.S. 359, 75 L. Ed. 1117, 51 S. Ct. 532 (1931), and *Yates v. United States*, 354 U.S. 298, 1 L. Ed. 2d 1356, 77 S. Ct. 1064 (1957). However, these cases discussed a general verdict where one of several clauses of a statute is unconstitutional. See *Stromberg*, 283 U.S. at 360, 75 L. Ed. at 1118, 51 S. Ct. at 532; *Yates*, 354 U.S. at 299, 1 L. Ed. 2d at 1357, 77 S. Ct. at 1065. Thus, in *Stromberg*, the Court noted that the jury was instructed that its verdict could be given with respect to any of several clauses in a statute, and therefore, if any of the clauses were held to be invalid, it would be impossible to determine that the appellant was not convicted under that clause. *Stromberg*, 283 U.S. at 368, 75 L. Ed. at 1122, 51 S. Ct. at 535. In *Yates*, the Court noted that a verdict should be set aside where it is supportable on one ground, but not on another, and it is impossible to determine which ground the jury selected. *Yates*, 354 U.S. at 311-12, 1 L. Ed. 2d at 1371, 77 S. Ct. at 1073. In this case, none of the sections of the first degree murder statute have been held to be unconstitutional and, as discussed, the felony murder count was properly based on the predicate offense of aggravated discharge of a firearm. Moreover, as also previously discussed, we can discern from the jury's verdict that it did not find defendant guilty based upon the felony murder theory. Finally, our supreme court has applied the presumption in situations similar to that presented in this case (see *Morgan*, 197 Ill. 2d at 448), and we therefore continue to do the same.

In summary, we find there was no error in the instructions given to the jury and that, based upon the presumption discussed above, any possible error was harmless. Accordingly, defendant's contention does not rise to the level of plain error and we find that it is waived.

Defendant finally contends that he was denied a fair trial by improper comments made by the prosecutor during closing arguments. We disagree.

We find that defendant's claim is waived because he failed to object to any of the challenged comments when they were made and he did not include the issue of prosecutorial misconduct in his posttrial motion. See *Enoch*, 122 Ill. 2d at 186-87; *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007) ("To preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion"). Defendant acknowledges that this contention is waived but, once again, asks that we review the issue under the plain error rule. However, we must first determine whether the complained-of prosecutor's remarks were error. *Smith*, 372 Ill. App. 3d at 181.

The prosecution is afforded wide latitude in making closing arguments so long as the comments made are based on the evidence or reasonable inferences drawn therefrom. *People v. Williams*, 192 Ill. 2d 548, 573 (2000). When reviewing a challenge to remarks made by the prosecution during closing arguments, the comments must be considered in context of the entire closing arguments made by both parties. *People v. Wiley*, 165 Ill. 2d 259, 295 (1995). A reviewing court will not reverse a jury's verdict based upon improper remarks made during closing arguments unless the comments were of such magnitude that they resulted in substantial prejudice to defendant and constituted a material factor in his conviction. *People v. Griffin*, 368

Ill. App. 3d 369, 376 (2006).

Defendant initially claims that the prosecution improperly distorted the scientific evidence presented at trial. Defendant specifically asserts that the prosecution made "unsubstantiated conclusions" when it told the jury that the scientific evidence conclusively proved that he was the person who shot and killed the victim because the State's expert forensic witnesses were unable to reach such a conclusion. Defendant complains of the following comments.

First, during closing arguments, the prosecutor discussed the testimony of the ballistics expert that the shell casing found at the scene matched the gun that defendant dropped in the alley and stated, "I submit to you that cartridge in the gun alone is enough to convict this defendant but in this case, you have so much more."

Defendant takes this comment out of context in arguing that it was improper and ignores the prosecutor's argument that proceeded the complained-of remark as well as the comments which followed. Prior to making this comment, the prosecutor told the jury that there was a "mountain" of circumstantial evidence which proved defendant guilty of first degree murder beyond a reasonable doubt. The prosecutor then discussed that evidence, including the testimony of the witnesses who observed the entire incident but did not see who was driving the tan vehicle and the testimony of the police officers who pursued defendant after the shooting. The prosecutor discussed the gunshot residue evidence, the bullet found at the scene, the pictures of the tan vehicle in the alley which corroborated the testimony that the vehicle's driver's side window was rolled down, and the fact that the cartridge found at the scene of the crime matched the gun that defendant dropped from his hand in the alley. The prosecutor then made the disputed

31

comment that the cartridge case alone was enough to convict defendant but added that, "in this case, you have so much more." The prosecutor proceeded to review the testimony of the eyewitnesses who identified defendant as the driver of the tan vehicle and as the person who shot and killed the victim. Viewed in this context, it is apparent that the prosecutor's remarks were made as part of a larger argument that the circumstantial evidence alone was sufficient to prove defendant's guilt and that, when that evidence was considered along with the eyewitness testimony, defendant was proven guilty of first degree murder beyond a reasonable doubt. As such, we find no error in the prosecutor's comment.

The second complained-of comment regarding the scientific evidence was made by the prosecutor during rebuttal.

"Once again, ladies and gentlemen, this ballistics evidence, this gun, this casing, this bullet incontrovertible, irrefutable, scientific proof beyond a reasonable doubt and then some evidence that this is the guy who killed Jess Sandoval.

This is the guy who fired the gun. The shell casings found on the scene, a bullets [*sic*] found on the scene, the gun is dropped by him exactly where Dave Williams said he dropped it. Exactly where Peter Lacher recovered it. Gun is in the same condition it was when Brian Paw examined it and ballistics is not just a theory. It's a science and it's incontrovertible proof that this guy is the one who did it."

We find nothing improper in this line of argument by the prosecutor because it was supported by the evidence presented at trial. Officer Williams testified that defendant was holding a handgun when he exited his vehicle and that defendant threw the gun to the ground before he fled the alley. Forensic investigator Larcher testified that he recovered that handgun from the alley as well as a .40-caliber cartridge and a fired bullet from the scene of the murder. Forensic scientist Parr testified that in his opinion the .40-caliber cartridge case was fired from the handgun that was recovered from the alley. Thus, in making the complained-of comments, the prosecutor was merely drawing reasonable inferences from this evidence in order to argue that defendant was the person who fired the weapon and killed the victim. Because the prosecutor's remarks were supported by the evidence and reasonable inferences drawn therefrom, we find that they were proper.

Defendant finally claims that the prosecutor distorted the scientific evidence by making the following comments regarding the gunshot residue during rebuttal:

> "And miraculously, after all of that activity there's still one unique
> particle, unique to be gunshot residue. Don't ever forget that. One
> unique particle that came from the firing of the gun from nothing
> else; that's what the scientific evidence is and he asked you now,
> well, they didn't test that –."

Defendant claims that this argument was improper because the scientific evidence did not conclusively establish that the residue came from a fired weapon.

Contrary to defendant's argument, we do not believe that the prosecutor was arguing that

the forensic evidence conclusively established that the "one unique particle" came from the firing of the weapon that defendant dropped in the alley and that was found by the police. In fact, during the State's initial closing argument, the prosecutor discussed the expert witness testimony as having established that there was one particle unique to gunshot residue on defendant's right hand and acknowledged that, according to that expert, defendant "*may* have fired a gun." (Emphasis added.) However, the forensic expert did testify that there was one particle on defendant's hand that was unique to gunshot residue. The prosecutor spent significant time during closing attempting to connect the various pieces of evidence, including the bullet and shell casing found as the scene as well as the handgun defendant dropped in the alley. Viewed in context of the State's entire closing argument, we believe that when the challenged remark was made, the prosecutor was referencing the forensic evidence that there was one unique particle on defendant's hand and arguing that, based upon that and the other evidence presented at trial, it was reasonable to infer that defendant had gunshot residue particles on his hand because he fired a weapon and killed the victim. Moreover, even if we were to assume that the prosecutor improperly stated that the scientific evidence established that the one unique particle positively came from the weapon found in the alley, the challenged remark was brief and isolated and therefore did not deny defendant a fair trial. See *People v. Gorosteata*, 374 Ill. App. 3d 203, 226 (2007) (finding that the challenged comments made by the prosecutor were "minor and transitory" and therefore did not deny defendant a fair trial).

Defendant next claims that the prosecutor improperly shifted the jury's focus from the facts of the case by disparaging defense counsel's integrity and suggesting that counsel was a

"slanderer" and a "liar."

Defendant first complains of the following comment made by the prosecutor during rebuttal:

> "And its an old trick. It's one of the oldest tricks in the building.
> How many of you right now to yourselves think that Manuel Rayo
> was a gang member or a criminal? Probably a lot of you because
> the way they so artfully and skillfully lumped him in with the other
> two guys who are gang members."

It is generally improper for the prosecution to accuse defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception. *People v. Love*, 377 Ill. App. 3d 306, 314 (2007). However, counsel may comment upon defense characterizations of the evidence or case and may respond in rebuttal to statements made by the defense counsel that clearly invite a response. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). In this case, when the complained-of comment is viewed in context, it is apparent that the prosecutor's remark was made in response to defense counsel's closing argument. Specifically, defense counsel made the following characterization of the State's witnesses during closing argument:

> "But look where the evidence is coming from. It's coming from
> gang bangers, convicted felons who walk around with guns, who
> walk around with dope, who can't remember anything, who got
> caught in lies and you are going to send somebody to prison based
> on that? You can't. It's not enough."

Defense counsel continued by characterizing the State's witnesses as "walking, talking, lying reasonable doubt," as well as "felons." Counsel concluded by telling the jury that it could retire to the jury room and "think about how they lied and think about where they're coming from, and think about what they're asking you to do based upon these liars."

In response to this line of argument, the prosecutor made the complained-of remarks in order to point out to the jury that defense counsel had improperly labeled all of the State's witnesses as "gang bangers." After doing so, the prosecutor argued that Rayo was not a gang member, that he had not been convicted of a crime, and that his trial testimony had not been meaningfully impeached. The prosecutor's comments were supported by the record, as there was no evidence presented at trial that Rayo was a gang member or that he had been convicted of a crime. Therefore, the prosecutor's remarks were not made to disparage defense counsel but, rather, were supported by the evidence and were made in response to defense counsel's characterization of the State's evidence. As such, we find that the comments were proper. See *Evans*, 209 Ill. 2d at 225.

Additionally, the brief reference to defense counsel engaging in "an old trick" was not a central theme in the State's closing argument and therefore did not shift the jury's focus away from the facts of the case or otherwise deny defendant a fair trial. See *People v. Kidd*, 147 Ill. 2d 510, 544 (1992) ("the assistant State's Attorney did not make just one fleeting, inadvertent remark ***. Rather, he commented *eight times* that defense counsel was 'raising a smoke screen,' or 'filling this courtroom with smoke today,' or 'hoping that the smoke he raises in this room today will strangle the truth like it strangled the life of the ten children,' etc. Thus, this case

36

is unlike other cases in which the prosecutor made only a passing reference to a 'smoke screen'
theme, and it was held not to be reversible error" (emphasis in original)).

Defendant further complains of the following comment made by the prosecutor during
rebuttal:

> "And that thing about opening statement and closing arguments not
> being evidence. When he talks about other occupants of the car
> and anything could happen in 20 minutes. Where is the evidence of
> that? You took an oath all right. You took an oath to follow the
> law and listen to the evidence, *not listen to whatever story they*
> *want to spin.*
>
> They can stand up here for days and tell you all the sorts of
> different things that aren't involved with the evidence." (Emphasis
> added.)

We again find that the prosecutor, in making these remarks, was properly responding to
defense counsel's characterization of the evidence during closing argument. Defense counsel
specifically argued that defendant was arrested 20 minutes after the shooting occurred and argued
that, based upon the time it would have taken for defendant to drive from the scene of the
shooting to the alley where he fled the vehicle, there was approximately 8 to 12 minutes that were
not accounted for. Counsel further argued that Officer Williams lost sight of defendant during the
car chase and that anything "could have happened to the occupant or occupants of that car in that
period of time."

In response to this argument, the prosecutor reminded the jury that defense counsel's arguments were not evidence and that the jury had taken an oath to decide the case based solely upon the evidence presented at trial. The prosecutor then argued that there was no evidence presented at trial to support defense counsel's argument that something could have happened to the occupant or occupants of the car during the time that it was being pursued by Officer Williams. We believe that these remarks were not made in order to characterize the defense theory as an attempt to mislead and confuse the jury, as defendant suggests, but rather were made in order to argue that the theory advanced by defense counsel was unsupported by the evidence and should therefore be disregarded by the jury. Accordingly, the remarks were a proper comment on the persuasiveness of the defense theory of the case. See *Love*, 377 Ill. App. 3d at 314 (prosecutor may comment on the persuasiveness of the defense theory of the case). Moreover, the prosecutor's reference to the story defense counsel wanted to "spin" was brief and isolated and therefore did not distract the jury from deciding defendant's guilt based upon the facts of the case. See *Kidd*, 147 Ill. 2d at 543-44.

Defendant next complains that the prosecution accused defense counsel of employing stereotypes to turn the jury against the State's witnesses in order to win an acquittal. The record shows that during cross-examination, defense counsel asked Jorge Serrano if he was "smoking dope" when he witnessed the shooting and Serrano responded that he was not. Defense counsel also asked Serrano if he was getting high at the time, and Serrano again responded in the negative. The trial court then sustained the prosecutor's objection to this question and told defense counsel to ask another question. During rebuttal, the prosecutor reminded the jury that

arguments by counsel were to be confined to the evidence or reasonable inferences therefrom and that neither opening nor closing arguments were to be considered as evidence by the jury. The prosecutor then made the following argument, which includes the comment of which defendant now complains:

"And any statement or argument made by then [*sic*] attorneys which is not based on the evidence should be disregarded so all of that stuff that goes to his question when he's asking Serrano, what were you smoking marijuana, were you drinking? No.

Where is the evidence of that? It's not a wish it were or it could have been. *Oh, I think I'm going to appeal to this group of 12 people, I'm going to appeal to their stereotypes and I'm going to say, you know what, this kind had to be out there drinking and all this other kind of stuff.* The fact of the matter, he wasn't.

And if there were evidence of it, they would have shown it to you though some type of impeachment. But it's not there. It's not there because it didn't happen that way." (Emphasis added.)

Contrary to defendant's assertion, the prosecutor's argument was not directed at imputing bad faith on the part of defense counsel. As defendant acknowledges, defense counsel had no proof that Serrano was "smoking dope" or "getting high" at the time he witnessed the murder. Moreover, defense counsel failed to present any evidence through the remainder of trial in order

39

to perfect this attempted impeachment. Accordingly, in making the complained-of remarks, the prosecutor was commenting on defense counsel's unsupported attempt to impeach Serrano's testimony and countering that attempted impeachment by reminding the jury that statements or arguments of counsel were not evidence, that the evidence the jury should consider came from the testimony of the witnesses, and that the jury should not rely upon any preconceived notions in evaluating the credibility and testimony of those witnesses. To this end, the prosecutor pointed out that there was no evidence presented at trial establishing that Serrano was using narcotics at the time he witnessed the shooting and that, had there been any such evidence, defense counsel would have brought it to the attention of the jury. Therefore, viewed in context, the prosecutor was responding to defense counsel's attack on Serrano's credibility and arguing to the jury that, based on the facts in evidence, the jury should find Serrano to be a credible witness. Argument directed at the credibility of the witnesses is a proper subject of closing arguments (*People v. Cloutier*, 156 Ill. 2d 483, 508-09 (1993), and we therefore find no error in the prosecutor's argument.

Moreover, we again find this challenged remark was brief and isolated and therefore did not deny defendant a fair trial. See *People v. McCann*, 348 Ill. App. 3d 328, 338-39 (2004) (holding that a prosecutor's reference to defense counsel as "an octopus releasing inky fluid" and as "throwing dust on the road to justice" did not deny defendant a fair trial and amount to plain error where "the complained-of comments, when viewed in the context and totality of the closing arguments, were brief and isolated").

Defendant finally complains that the State improperly attacked defense counsel over his

comments regarding Officer Williams' lack of experience as a police officer. Defendant asserts that the prosecution accused defense counsel of resorting to slander in order to obtain an acquittal by the following comments:

> "They talked to you about Dave Williams is a young guy. He's a rookie. He's just trying to make points with the higher ups.
>
> Let's talk about that rookie thing first. What did Dave Williams do when he went back to where that gun was? Put a box over it to protect it from the snow.
>
> Ladies and gentlemen, I submit to you that there are police officers with maybe 20 years on the job who are not going to have the heads up sense that Dave Williams after two years did. Dave Williams is a heads up officer. Dave Williams is a guy who is going to do the right thing and that's what he did here and to have him say well, Dave Williams is out there trying to impress the higher ups. He's trying to make good points or something like that where there is absolutely no evidence whatsoever. Absolutely no evidence whatsoever. Dirty up a police officer. Why? Well, because it's kind of a fashionable thing to do."

In this case, contrary to defendant's argument, the prosecutor's remarks were not made to accuse defense counsel of resorting to slander to obtain an acquittal. Instead, it appears that the challenged remarks were made in direct response to defense counsel's closing argument

suggesting that Officer Williams testified falsely at trial. Specifically, defense counsel stated:

> "Lets talk about Officer David G. Williams who at the time of the shooting was still a green cop, just barely over from being a rookie two years on the force. I know you want to believe him. I know with his ramrod posture, his uniform, you want to believe him because of his uniform, because of the badge, you know, because of his job you want to believe everything he said because it's only natural, he's a police officer whose [sic] here to serve and protect us, citizenry."

Defense counsel continued to argue that Officer Williams "embellished the truth" and "added stuff up to make it an open and shut case." Counsel questioned the validity of Officer William's testimony regarding defendant's vehicle having stopped at the red light after the shooting and regarding the amount of time it took for defendant to drive from the scene of the murder to the alley. Defense counsel concluded by arguing that Officer Williams testified falsely about having seen defendant drop the weapon and stated:

> "*Two years on the force he wants to make an impression with the higher ups.* I was behind that guy all the way. I saw him drop the gun right in from of me, dropped it right in front of me.
>
> Life isn't that easy. It's not that convenient for people. The world's more complicated than that unless you're fudging, unless you wanted to make it an open and shut case." (Emphasis added.)

As noted, a prosecutor may respond to comments made by defense counsel which clearly invite a response. *Evans*, 209 Ill. 2d at 225; *People v. Starnes*, 374 Ill. App. 3d 132, 135-36 (2007). In context, we believe the prosecutor's remarks were a proper response to defense counsel's argument that Officer Williams testified falsely in order to impress "the higher ups." Therefore, we find no error in the prosecutor's remarks.

Defendant's final claim regarding improper closing arguments is that the prosecutor made comments directed at inflaming the jury's passion and fear. Defendant argues that the prosecutor attempted to distract the jurors from the question of his guilt and instill an emotional element into their deliberations.

Defendant initially asserts that during closing, the prosecutor "set the emotional stage on which he was to play out his argument" by stating, "[m]ost people on December 2, 2002 were busy with holiday cheer and getting gifts, this defendant was giving out death and destruction from the barrel of a gun." We find no error in this comment. The prosecutor was commenting on the evidence, which established that on December 2, 2002, defendant shot and killed the victim, Jesse Sandoval. The prosecutor was also engaging in invective in order to denounce defendant's behavior. A prosecutor may properly "denounce a defendant's behavior, engage in some degree of invective and draw [reasonable] inferences unfavorable to the defendant if such inferences are based upon the evidence." *People v. Aleman*, 313 Ill. App. 3d 51, 66 (2000); *People v. Baugh*, 358 Ill. App. 3d 718, 743 (2005).

Defendant next asserts that during rebuttal, the prosecutor invoked a highly emotional personal story to prevent the jurors from giving any weight to the prior inconsistent statements

used by defense counsel during cross-examination to challenge the credibility of the State's eyewitnesses. The prosecutor specifically argued:

"[Eduardo Negrete and Manuel Rayo] didn't know whether they were behind a tree or between two cars. Who cares. Who cares. Where were you when you saw the towers get hit on 9/11. I remember where I was. I was on my way to work. I could not for the life of me tell you what suit I was wearing.

I remember I was walking by downtown, walking by the window where they have a bunch of TVs on and I thought, that's really a terrible commercial, whoever is doing that trying to sell stocks and bonds from that World Trade Center there. That's a terrible thing and I realized it was real but I couldn't tell you if you held a gun at my head.

I couldn't tell if I knew Gilberto Gonzalez was driving that Oldsmobile with that 40 caliber pistol coming to shoot me up because I stood on the wrong corner. What suit I was wearing. I couldn't tell you the exact address of the place I was at. I couldn't tell you how close to the window I was or how far awar from the window I was. I couldn't tell you what the gu[y] to the right of me looked like. I couldn't tell you what the person to the left of me looked like.

> I know it affected me and I know I will never forget it.
>
> Ladies and gentlemen, Eduardo Negrete, Jorge Serrano,
>
> Manuel Rayo they're never going to forget the face of the guy who
>
> killed Jesse Sandoval either, and you know that through your
>
> common sense."

Defendant claims that, by making this argument, the prosecutor used the deeply emotional events of September 11 to drive home the fact that he believed that the eyewitnesses' identification of defendant was correct and thereby improperly bolstered those witnesses' credibility and appealed to the jury's passions and prejudices.

Contrary to defendant's argument, the prosecutor's remarks were not made to compare the shooting of Jesse Sandoval to the events of September 11, 2001, or to improperly bolster the credibility of the State's eyewitnesses. Rather, the remarks were made in direct response to defense counsel's theme during closing arguments. During closing, defense counsel attacked the credibility of the State's witnesses, arguing that they had "convenient amnesia" and that their testimony was "rehearsed." In support of this claim, counsel argued that while the State's eyewitnesses were able to identify defendant as the shooter, they were unable to remember certain details such as where they were standing at the time the victim was shot. Counsel then stated:

> "How can you forget everything else, how can you forget
>
> what you yourself did, where you yourself were when the shooting
>
> starts? When there's a mementos [*sic*] event in someone's life, you
>
> remember exactly where you were. I don't know you guys look

45

pretty young. I don't know if anybody remember[s] when John

Kennedy was shot, but I do and I was only eight years old.

I remember exactly what I was doing at that point. But

when you're on a corner of a street and a friend of yours was

gunned down you remember exactly what you were doing, what

you did. It's almost as if time freezes in slow motion and encrypted

in your skull."

In context, we believe that the prosecutor's remarks were a proper response to defense

counsel's reference to the assassination of John Kennedy and argument that, because defense

counsel knew where he was standing when Kennedy was shot, the State's eyewitnesses would

remember where they were standing if they had truly witnessed defendant shoot Jesse Sandoval.

See *Evans*, 209 Ill. 2d at 223, 225 (prosecutor's reference to the O. J. Simpson case and the

phrase "rush to judgment" were not made to compare defendant to O. J. Simpson but, rather,

were comments in response to defense counsel's theme phrase during closing arguments that the

police and prosecution had "tunnel vision" and failed to throughly investigate other suspects). In

response to defense counsel's comments, the prosecutor used a similar analogy to argue to the

jury that the witnesses' failure to remember every detail at the time of the shooting did not render

their identification of defendant as the shooter incredible. Accordingly, we find that the

prosecutor's argument was proper.

Defendant finally asserts that the prosecutor appealed to the jury's sense of fear by telling

the jury that it was their job to protect society from defendant. The prosecutor specifically stated:

> "Ladies and gentlemen, Counsel said you are standing
>
> between your Government and sending this man to prison. You
>
> got a bigger job than that to do. You're standing between this
>
> defendant and the rest of the community."

Considered in context, the prosecutor was responding to comments made by defense counsel during closing. Defense counsel specifically stated:

> "The burden of proof is solely on the government. You all
>
> agreed to that proposition. You are the citizens that stand between
>
> the Government and Gilberto Gonzalez."

Defense counsel's statement appears to have been made in order to impassion the jury to stand up to the government and find defendant not guilty. In responding to defense counsel's argument by making the challenged comments, the prosecutor was urging the jury to fearlessly administer the law while characterizing the jury's duty to do so as being on behalf of the community. Not only may the prosecutor respond to arguments by defense counsel that clearly invite a response, but the prosecutor may also urge the fearless administration of justice. *Baugh*, 358 Ill. App. 3d at 743. Therefore, we find no error in the prosecutor's comments.

We conclude by finding that the challenged prosecutorial remarks, viewed either individually or cumulatively, were not of such a magnitude that defendant was denied a fair trial.

First, as previously discussed, the evidence of defendant's guilt in this case was overwhelming. See *Cloutier*, 156 Ill. 2d at 509 (finding that, in light of the overwhelming evidence of defendant's guilt, "none of the[] alleged prejudicial comments were of a magnitude

sufficient to have altered the trier of fact's determination of defendant's guilt"); *Gorosteata*, 374 Ill. App. 3d at 225-27 (finding that the State's improper comments during closing argument did not rise to the level of plain error where the evidence of the defendant's guilt was overwhelming and where the improper comments were "minor and transitory").

Second, the trial court instructed the jury that closing arguments were not evidence and that closing arguments were to be confined to the evidence and to reasonable inferences drawn therefrom and that the jury should disregard any statement made by the attorneys that was not based on the evidence. The trial court also gave the jury these instructions in writing. These repeated admonitions ameliorated any possible prejudice resulting from the prosecutor's allegedly improper remarks. As this court has noted:

> "Regulation of remarks by counsel is best left to the trial court's discretion, which may cure such errors by giving proper jury instructions on the law, informing the jury that counsel's arguments are not evidence and to be disregarded if not supported by the evidence at trial, or by granting an objection and admonishing the jury to disregard comments." *People v. Tijerina*, 381 Ill. App. 3d 1024, 1032-33 (2008), citing *People v. Simms*, 192 Ill. 2d 348, 396 (2000).

See also *Griffin*, 368 Ill. App. 3d at 377 (finding any error in improper prosecutorial comments during closing arguments harmless where the court instructed the jury that closing arguments were not evidence and should be confined to the evidence and reasonable inferences drawn

therefrom, and noting that "[i]nstructions of this sort decrease the likelihood that improper remarks in the prosecutor's closing argument rose to the level of plain error"); *People v. Phillips*, 127 Ill. 2d 499, 524 (1989) (improper comment during closing arguments is only plain error when the comment was either so inflammatory that the defendant could not have received a fair trial or so flagrant that it threatens the deterioration of the judicial process).

Accordingly, we find that not only was there no error in the prosecution's closing arguments, either individually or cumulatively, but also that any possible error was not sufficiently prejudicial and did not constitute a material factor in defendant's conviction. Therefore, defendant's contention regarding improper closing arguments does not rise to the level of plain error and we find this contention waived for purposes of appeal.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

J. GORDON and CAHILL, JJ., concur.