THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ONDREA EDGESTON, Defendant-Appellant.

Second District   No. 2—91—0679

Opinion filed March 29, 1993.

2

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Charles M. Schiedel and Jon E. McPhee, both of State Appellate Defender's Office, of Springfield, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Ondrea Edgeston, was charged by indictment with first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1) and attempted murder (Ill. Rev. Stat. 1989, ch. 38, par. 8—4(a)). A jury acquitted him of the attempted murder charge but convicted him of first degree murder, and the court sentenced him to 60 years in prison. On appeal defendant challenges the sufficiency of the evidence against him and alleges ineffective assistance of trial counsel.

On March 10, 1990, around 1:30 a.m., Charlotte Meyers heard someone knock at her front door. The knocking grew louder until it sounded like someone kicking the door. Moments after telling her son

to call the police, Meyers heard a gunshot which sounded like it was just outside the front door. Police arrived about 10 minutes later.

At 2 a.m. a Rockford fire department dispatcher received an emergency call from Claire Constantine, who said she had been shot. Constantine told the officer who responded to the call that she had awakened to find two masked men in her home. One of them shot her, and they fled. Constantine died a short time later from a gunshot wound.

Shortly before 3 a.m. a Winnebago County deputy sheriff responded to a possible burglary call on Fitzgerald Road, about a mile from the Constantine residence. He found Brian DuBrock on the back porch of a house, bleeding from a gunshot wound in the left shoulder.

Around 4 a.m. Rockford police responded to a call at 1116 Irving. There they found Forest King lying in the first-floor hallway. King had been shot but was able to tell the officers that the name of his assailant was "Ondrea Edgeston." Shortly thereafter, acting on an anonymous phone tip, the police found defendant and Ricky Sullivan in an apartment at the 1116 Irving address. Defendant was taken into custody, and Sullivan was arrested a short while afterwards.

Later that morning witnesses found one newly spent shotgun shell on Fitzgerald Road and another near the garage at the home where Brian DuBrock had been found bleeding. Charlotte Meyers found a key, shotgun wadding, and a swatch of black cloth near a five-inch circular burn containing pellet marks which had been made in her porch.

Defendant told police Sullivan had shot King. One of the detectives, however, noticed what appeared to be blood on defendant's coat. Later that day Officer Rice told defendant that the police believed he, rather than Sullivan, had shot King; that the blood on his coat was from the victim; and that he knew where the gun was. Defendant then told Rice the gun was under some brush in an alley across from Auburn Manor Apartments. The police later found a single-barrel, sawed-off shotgun at the location defendant had described.

When police told him they knew there was another shooting, defendant indicated that he and Sullivan had been driving in a car and picked up a man walking down the road. Sullivan had demanded the man's money and then shot him as he tried to escape from the car. When asked if Sullivan had shot "the lady" too, defendant responded affirmatively and indicated that he had waited outside while Sullivan went into the lady's house. Detectives Rice and Pobjecky then typed defendant's statement. When later confronted with Sullivan's statement that defendant had been in the house with him when

Claire Constantine was shot, defendant admitted he was there but maintained that he had not shot the victim.

Defendant and Richard Sullivan were subsequently charged with the murder of Claire Constantine and the attempted murder of Brian DuBrock. (Apparently, charges arising from the murder of Forest King were brought separately and are not pertinent to this appeal.) The indictment alleged that the defendants killed Constantine while committing the forcible felony of burglary at Constantine's home. No other form of murder was charged.

At trial the prosecution read to the jury defendant's statement to Detectives Rice and Pobjecky. Rice then testified regarding admissions made by defendant after the typed confession was taken. Defendant told him that he had obtained the shotgun from his sister's boyfriend and that Sullivan shot Constantine as she came down the hall towards him and Sullivan. Defendant also told Rice the location of a dumpster where he and Sullivan had placed the pants they wore at the time of the shootings. The pants were later retrieved from the dumpster.

Other trial testimony revealed that defendant and Sullivan were at the Manhattan Club a few hours before the shootings. They met Mark Cox, who lived with defendant's sister and her boyfriend, Antoine Goodwin. According to Cox, defendant asked Cox if he could use a sawed-off shotgun that Cox and Goodwin kept at their apartment. Cox agreed to supply defendant and Sullivan with a gun and phoned Goodwin to tell him defendant was coming over to get the weapon. Defendant and Sullivan left the Manhattan Club together around 12:30 or 1 a.m.

Defendant and Sullivan arrived at Goodwin's apartment 5 or 10 minutes after Goodwin spoke with Cox. According to Goodwin's testimony, Cox had told him there was going to be trouble at the Manhattan Club and he needed a gun. Goodwin placed the shotgun and some shells in a gym bag and gave the bag to defendant. At that time defendant was at the apartment for only two or three minutes, just long enough to pick up the gun. However, around 3 a.m. that morning defendant and Sullivan again came to Goodwin's apartment, arriving in a small tan or beige car. Goodwin testified that he did not know if "it was an Escort or what." Both defendant and Sullivan had blood on their pants. When Goodwin asked what happened, Sullivan responded that "[s]he woke up and I just started blasting." Goodwin told the two men they had to leave.

Additional testimony about the night of the shootings, and evidence gathered afterwards, completed the State's case against

defendant. Barbara Cox, Sullivan's girlfriend, testified that Sullivan was with her, at her home, the evening before the shootings. Around 10:30 defendant telephoned and spoke with Sullivan. Shortly afterwards, Sullivan left in Barbara Cox's tan Omni. He did not return the car. Brian DuBrock remembered that he was walking toward his home on Fitzgerald Road when two black men in a car stopped and asked him if he needed a ride. He heard them ask for his wallet. The next thing he recalled was getting shot. He guessed that Sullivan, the guy with "kinky hair," had shot him. DuBrock's driver's license was found in the glove box of the car Sullivan and defendant had used the night of the shootings. The key Charlotte Meyers found on her front porch worked the lock of the glove compartment of the Omni. Finally, the fibers in the piece of black cloth found on Meyers' porch were consistent with the fabric of the jeans Sullivan had discarded in the dumpster the morning of the shootings.

Defendant testified in his own behalf. He had become reacquainted with Sullivan, who had only recently been released from prison, one or two days before the shootings. During that time defendant and Sullivan visited with each other and with defendant's brother, sister, and other friends. The evening before the shooting incidents, at defendant's invitation, Sullivan picked up defendant and two girls and drove to the Manhattan Club. Sullivan was driving Barbara Cox's Omni.

At the Manhattan Club defendant and Sullivan drank beer and whiskey. Sullivan told defendant to come with him "to make some money," meaning to do a burglary. At first defendant ignored Sullivan because he did not want to go with him. They then saw Mark Cox. Contrary to Cox's testimony that defendant asked about the gun, defendant testified that Sullivan told Cox he needed a gun, and Cox made the call to Antoine Goodwin. Defendant went into Goodwin's apartment to get the gun while Sullivan waited in the car. Defendant then returned to the car and handed the gym bag containing the gun to Sullivan, who placed it on the back floor of the car. Defendant, who was feeling drunk, fell asleep as they were riding in the car.

Defendant next testified essentially that, at Sullivan's direction, he followed Sullivan into Constantine's house. He followed because he was scared Sullivan might hurt him, and he did not want to get Sullivan upset. Once inside the house defendant started to dismantle a stereo set. However, he heard a scream so he dropped the stereo and started running. As he was going out the door he heard a gunshot. Back in the car, Sullivan told him that he had not shot anybody. Ac-

cording to defendant, he did not know Constantine had been shot until the police asked him if he had done it.

About half an hour later Sullivan stopped for a hitchhiker. The man got in the backseat behind Sullivan. Shortly thereafter Sullivan pulled the car over, pointed the gun at the man, and demanded his money. When the man tried to get out the back door of the car, Sullivan shot him. The man ran away screaming. Defendant said nothing to Sullivan, as he was scared. Defendant did not take the man's billfold or driver's license from him, did not see Sullivan do so, and did not know how any of DuBrock's personal property got into the Omni. When asked why he did not try to get out of the car and leave when he saw Sullivan pointing the gun at DuBrock, defendant said he was scared Sullivan might hurt him, and he did not know where he was or how far he was from home.

On cross-examination defendant admitted that, although he knew Sullivan was a bad person, he had not been afraid to invite him to visit with his brother and sister. Defendant explained that Sullivan was a friend of defendant's brother and used to like defendant's sister, and he had wanted to see both of them. Defendant was not afraid, either, to invite Sullivan to drink and smoke with him at his friend's apartment. Sullivan left with defendant a phone number where he could be reached, and defendant called him at that number. Defendant made no protest when Sullivan allegedly asked Mark Cox about a gun. He said he went with Sullivan to get the gun because he was scared, even though Sullivan did not threaten him or force him in any way to leave the Manhattan Club. After picking up the gun at Goodwin's apartment, defendant was tired and drunk but did not ask Sullivan to take him home. He was scared Sullivan would hurt him if he refused to go with him. Defendant admitted that he knew he and Sullivan were going into Constantine's home to steal some of her property but again claimed he was scared of Sullivan because he knew what type of person he was.

During closing arguments the State told the jury that defendant was guilty of the offense charged, under the law of accountability. Defense counsel responded that defendant should not be held accountable for Sullivan's actions over which he had no control. Counsel urged the jury not to convict defendant with Sullivan's vicious acts and stressed that defendant went along only because he was afraid of Sullivan. He further asserted that justice would not be served by convicting defendant of murdering someone he did not murder.

During the jury instruction conference defense counsel objected to an instruction on accountability. He also objected to the first degree

murder instruction, insisting that, "A person is not guilty [of murder] just simply because he's present in committing [the] offense." When the State argued that felony murder is one of the definitions of first degree murder and that participation in the underlying felony makes an accomplice guilty of any resulting murder, counsel insisted that, "I don't believe that you have to be accountable for the actual breaking in of a home. And then naturally flows that you're guilty of a murder precipitated at the hands of another individual." Defense counsel further objected to the State's issues instructions for first degree murder, stating:

> "I don't believe that the State under the indictment should be able to prove this case, first degree murder, by accountability.
>
> * * *
>
> This is not a murder case under what they told the jury. They're going for accountability."

Finally, defense counsel sought an instruction on the defense of compulsion. The State contended that the compulsion defense was not available when the charge was murder and that, even if it was available, no evidence had been presented to support such a defense. The court refused defendant's tendered instruction. Defendant was ultimately convicted and sentenced and now appeals.

Defendant first posits that he was not proved guilty beyond a reasonable doubt of felony murder. He argues that the murder count was predicated on the felony of burglary, but the State's evidence showed he committed residential burglary rather than burglary. Residential burglary and burglary, according to defendant, are completely separate and distinct offenses, mutually exclusive of one another. Defendant's argument is meant to show that burglary is not a lesser included offense of residential burglary and the State's proof of residential burglary, therefore, did not prove defendant committed burglary. At oral argument defense counsel went one step further and steadfastly maintained that, even though they are separate crimes, defendant could not be charged with or convicted of burglary when the facts proved by the State reflected residential burglary. Defendant concludes that, since the State did not prove the underlying felony of burglary, the felony murder conviction cannot stand. The State recognizes that the facts proved at trial could establish residential burglary but urges that burglary is an included offense of residential burglary and that the facts, therefore, also established burglary. In our opinion, we do not need to decide the lesser included offense issue in order to resolve this case.

We note at the outset that section 9—1 of the Criminal Code of 1961 provides for felony murder as follows:

"A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

\* \* \*

(3) He is attempting or committing a forcible felony other than second degree murder." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3).)

"Forcible felony" is defined by a list of offenses which includes burglary, but not residential burglary. (See Ill. Rev. Stat. 1989, ch. 38, par. 2—8.) Accordingly, the State based the felony murder charge against defendant on the underlying offense of burglary rather than residential burglary.

Defendant bases his position that he should have been charged with residential rather than regular burglary primarily on the statutory definitions of the two offenses involved here. The burglary statute provides:

"A person commits burglary when without authority he knowingly enters or without authority remains within a building, housetrailer, watercraft, aircraft, motor vehicle as defined in The Illinois Vehicle Code, railroad car, or any part thereof, with intent to commit therein a felony or theft. This offense shall not include the offenses set out in Section 4—102 of The Illinois Vehicle Code, nor the offense of residential burglary as defined in Section 19—3 hereof." (Ill. Rev. Stat. 1989, ch. 38, par. 19—1.)

The offense of residential burglary is defined as follows:

"A person commits residential burglary who knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft." (Ill. Rev. Stat. 1989, ch. 38, par. 19—3.)

With regard to a "dwelling place," the statute provides:

"(a) Except as otherwise provided in subsection (b) of this Section, 'dwelling' means a building or portion thereof, a tent, a vehicle, or other enclosed space which is used or intended for use as a human habitation, home or residence.

(b) For the purposes of Section 19—3 of this Code, 'dwelling' means a house, apartment, mobile home, trailer, or other living quarters in which at the time of the alleged offense the owners or occupants actually reside or in their absence intend

within a reasonable period of time to reside." Ill. Rev. Stat. 1989, ch. 38, par. 2—6.

The offense of residential burglary was severed from the burglary statute in 1982. (See Pub. Act 82—238, eff. January 1, 1982 (adding ch. 38, par. 19—3); *People v. Thomas* (1990), 137 Ill. 2d 500, 519.) At the same time, the burglary statute was amended to indicate that burglary "shall not include" the offense of residential burglary. (See Pub. Act 82—238, eff. January 1, 1982 (amending Ill. Rev. Stat. 1981, ch. 38, par. 19—1).) In 1987 the legislature added subsection (b) to the definition of "dwelling" (see Pub. Act 84—1289, eff. January 1, 1987) (amending Ill. Rev. Stat. 1985, ch. 38, par. 2—6)), thus providing a definition of the word "dwelling" specifically for the residential burglary statute. Defendant contends that all of these statutory changes reflect a legislative intent that burglary and residential burglary are mutually exclusive offenses. He concludes that just as unlawful entry into a structure not a dwelling is not residential burglary, unlawful entry into the dwelling place of another is not " 'a burglary' " as that crime is now defined. We agree with defendant to the extent he asserts that burglary and residential burglary are different offenses. We do not agree that the statutory scheme precluded a charge of burglary here merely because the unlawful entry was to a residence.

In *People v. Bales* (1985), 108 Ill. 2d 182, our supreme court upheld the residential burglary statute against both due process and equal protection challenges. At the time *Bales* was decided the statutory definition of "dwelling" consisted only of what is now subsection (a) of the definition of dwelling, as set forth above. In reaching the conclusion that the residential burglary statute was not impermissibly vague, even though it did not define "dwelling place of another," the court noted the "shall not include" language of the burglary statute and focused on the statue's purpose:

"It is apparent that the legislature, in the residential-burglary statute, attempted to [make] this crime *** an offense against a particular type of structure or enclosure, that is, a structure or enclosure which is used for habitation purposes, and to make residential burglary a more serious offense than the ordinary illegal invasion of other types of structures or enclosures." *Bales*, 108 Ill. 2d at 191.

The equal protection argument in *Bales* was based on defendant's contention that there was no difference between residential burglary and burglary and, thus, there was no rational justification for classifying residential burglary as a Class 1 felony and burglary as a Class 2 felony. Nevertheless, the court found the statutory classification to

have a reasonable basis because the residential burglary statute was aimed specifically at protecting the privacy and sanctity of the home and because of the greater danger and potential for serious harm from burglary of a home as opposed to burglary of a business. (*Bales*, 108 Ill. 2d at 193.) In a later case, *People v. Thomas* (1990), 137 Ill. 2d 500, 519, the court cited *Bales* for the holding that the residential burglary statute is constitutional because it is distinct from the crime of burglary. *Bales* and *Thomas* clearly teach that burglary and residential burglary are different crimes.

■ That they are different, however, does not mean, as defendant appears to insist, that the State was precluded from charging him with burglary and instead required to charge him, if at all, with residential burglary. The burglary statute says that a person commits burglary when he unlawfully enters, among other structures, a "building" (Ill. Rev. Stat. 1989, ch. 38, par. 19—1). While the home of Claire Constantine falls within the definition of a "dwelling" as that word is used in the residential burglary statute (see Ill. Rev. Stat. 1989, ch. 38, par. 19—3), it also obviously was a building in the ordinary sense of the word. Hence, the burglary statute would seem to apply to defendant's conduct.

As we have already discussed, the "shall not include" language in the burglary statute is an expression of legislative intent that burglary and residential burglary should be treated as different crimes. The overall legislative scheme evidences an intent to make clear that an offender may not be charged with residential burglary—a crime with a more severe penalty—when he unlawfully entered a structure that was not a "dwelling place of another." (Ill. Rev. Stat. 1989, ch. 38, par. 19—3.) The question remains whether the statute works the other way, *i.e.*, whether the "shall not include" language precludes a charge of burglary when the offender unlawfully entered a building which was the dwelling of another. In *People v. Johnson* (1984), 129 Ill. App. 3d 399, 401, the court pointed out that the statutory provision that burglary "shall not include" the offense of residential burglary did not mean that burglary could not be a lesser included offense of the crime of residential burglary. The court then added regarding the "shall not include" provision:

> "Rather, such language seems to indicate no more than an admonition that when a dwelling unit is involved, the appropriate charge is residential burglary." *Johnson*, 129 Ill. App. 3d at 401.

In a vein similar, though not identical, to *Johnson*, we perceive the language as an admonition that when a dwelling unit is involved,

residential burglary may properly be charged as an independent offense without reference to burglary. We can find nothing in the specific language of the burglary statute, or in the overall statutory scheme for the offenses of burglary and residential burglary, to indicate that the legislature intended to prohibit the State from charging a defendant with burglary simply because the "building" entered happened to be a dwelling place. Since burglary and residential burglary are distinct and different crimes, we believe the prosecutor had the authority to charge defendant with either one.

The State's Attorney, as a representative of the People, has the duty to prosecute all criminal actions. (Ill. Rev. Stat. 1989, ch. 34, par. 3—9005; *People ex rel. Daley v. Suria* (1986), 112 Ill. 2d 26, 37.) It is his sole responsibility to evaluate the evidence and other relevant factors to determine what offenses can and should properly be charged. (*In re J.J.* (1991), 142 Ill. 2d 1, 7; *People ex rel. Daley v. Moran* (1983), 94 Ill. 2d 41, 51.) It is within the exclusive discretion of the State's Attorney to choose which of several charges to bring against a defendant, or whether to prosecute at all. (*In re J.J.*, 142 Ill. 2d at 6-7; *Moran*, 94 Ill. 2d at 45-46.) Our supreme court has repeatedly rejected arguments that challenge the asserted unbridled discretion of the prosecutor in charging a felony or misdemeanor, where the defendant's conduct comprises either offense. (See *People v. Coleman* (1990), 205 Ill. App. 3d 567, 577, citing *People v. Brooks* (1976), 65 Ill. 2d 343, 349; *People v. McCollough* (1974), 57 Ill. 2d 440, 444; *People v. Keegan* (1971), 52 Ill. 2d 147, 153; *People v. Rhodes* (1967), 38 Ill. 2d 389, 396.) That the prosecutor may be influenced by the respective penalties available under multiple applicable statutes does not, standing alone, give rise to a constitutional violation. *People v. Jackson* (1992), 231 Ill. App. 3d 801, 806, citing *United States v. Batchelder* (1979), 442 U.S. 114, 125, 60 L. Ed. 2d 755, 765, 99 S. Ct. 2198, 2205.

As we see this case, defendant unlawfully entered a building, which happened also to be Claire Constantine's dwelling place, with the intent to commit a felony. On these facts, defendant's conduct could have been prosecuted as burglary or residential burglary. Upon evaluating the evidence and other pertinent factors, the prosecutor acted within his discretion in choosing to charge defendant with burglary rather than the separate and different offense of residential burglary. It is of no consequence that the burglary served as a basis for a charge of felony murder. In sum, defendant's contention that he was not proved guilty of felony murder based on burglary, because the

State was precluded from charging and proving burglary, is of no avail.

Having concluded that defendant was properly charged with and tried for burglary, we turn to defendant's claim that he received ineffective assistance of counsel. Defendant maintains that counsel either misunderstood or ignored the principles of felony murder and accountability. He points out that counsel acknowledged defendant's participation in the burglary that served as a predicate for the felony murder charge while, at the same time, pursuing the theory that, since defendant did not actually inflict the fatal wound, he could not be held accountable for murder—a theory that the State agrees was not supported by the weight of authority. Defendant further claims that, inasmuch as a compulsion defense is not available to an accused charged with murder, counsel failed him when he proposed that defendant's participation in the crimes was motivated by fear of Sullivan. Defendant concludes that he was left defenseless and the prosecution's case, therefore, was not subjected to meaningful adversarial testing, thus necessitating a new trial.

To prevail on a claim of ineffective assistance of counsel a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 397; *People v. Albanese* (1984), 104 Ill. 2d 504, 525, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) The court may proceed directly to the second part of the *Strickland* test and, if it does not find the requisite prejudice, may decide the claim without analyzing the effectiveness of counsel's representation. (*People v. Enoch* (1991), 146 Ill. 2d 44, 56-57; *Pitsonbarger*, 142 Ill. 2d at 397.) To show actual prejudice defendant must establish that, except for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) A reasonable probability is a probability sufficient to undermine confidence in the result. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) The defendant bears the burden of showing that, absent counsel's errors, the fact finder would have had a reasonable doubt respecting the defendant's guilt. (*People v. Edwards* (1991), 218 Ill. App. 3d 184, 197-98.) After reviewing the record in its entirety, we cannot say that defendant was so prejudiced by counsel's representation that he was denied a fair trial.

■ Although, as defendant points out, compulsion is not available as a defense to a murder charge (see *People v. Gleckler* (1980), 82 Ill. 2d 145, 155-57; *People v. Doss* (1991), 214 Ill. App. 3d 1051, 1056), in this particular case counsel's urging to the contrary could not have significantly prejudiced defendant. The record is devoid of evidence which might have corroborated defendant's claim that he acted out of fear. Nowhere is there any indication that defendant was at any time threatened, forced, or coerced by Sullivan. On the other hand, the record is replete with evidence, including his own evidence, that defendant acted on his volition throughout the hours he and Sullivan went on their violent rampage. Thus, the jury was presented with a compulsion argument based only on defendant's self-serving testimony—testimony which was contradicted by voluminous evidence that defendant was not afraid. Under these circumstances it is not reasonably probable that the trial would have turned out differently if it had not been for counsel's misplaced reliance on a compulsion defense. Defendant has not shown ineffective assistance of counsel on this basis.

Nor, in our opinion, did counsel's trial tactics—acknowledging the burglary but rejecting accountability for felony murder—sufficiently prejudice defendant to require a reversal and new trial. The proof that defendant committed burglary was overwhelming. The State introduced evidence of both written and oral statements defendant made to police shortly after the shootings, in which he admitted the burglary. He also admitted he had procured the shotgun and told police where to find not only the gun but also his and Sullivan's pants. Much of defendant's statements to police was extensively corroborated by other witnesses, such as Mark Cox and Antoine Goodwin. Barbara Cox loaned Sullivan her tan Omni a few hours before the incidents, and Goodwin said defendant and Sullivan arrived at his apartment at 3 a.m. in a tan car, possibly an Escort. The glove compartment key of the Omni was found on a porch near Constantine's house. Fibers also found on the porch were consistent with the jeans retrieved from the dumpster described by defendant.

In the face of this mountain of evidence against defendant, it would have made no sense to deny or ignore his part in the burglary. What defendant refers to as counsel's concession of his guilt was, in actuality, nothing more than stating the obvious. Consequently, even if counsel had not acknowledged the burglary, the jury would have had all it needed to convict defendant of felony murder based on accountability. We do not believe that, absent counsel's acknowledgment, the jury would have had a reasonable doubt that defendant participated in

the predicate offense. If anything, counsel's recognition of defendant's role in the burglary was merely cumulative. As such, it is difficult to see how it prejudiced defendant with regard to his murder conviction.

Too, counsel's attacks on the State's use of accountability to charge defendant with felony murder may not, in fact, have been totally out of place. The jury apparently took the argument into account when it acquitted defendant of the attempted murder of Brian DuBrock. In any event, we again do not think that, but for counsel's misstatements, there is so great a probability the trial would have turned out differently that our confidence in the actual outcome is shaken. (See *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Hence, defendant has not shown that he was so prejudiced that he was denied a fair trial, and he cannot prevail on his claim of ineffective assistance of counsel.

For all of the reasons set forth above, the verdict, judgment of conviction, and sentence entered by the circuit court of Winnebago County are affirmed.

Affirmed.

INGLIS, P.J., and GEIGER, J., concur.