2024 IL App (1st) 221030-U

No. 1-22-1030

THIRD DIVISION
February 28, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 13961 (01) |
| | ) | |
| ROGELIO ARROYO, | ) | Honorable |
| | ) | Laura Ayala-Gonzalez, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE D. B. WALKER delivered the judgment of the court.
Presiding Justice Reyes and Justice Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction of first-degree murder where the police had probable cause to arrest defendant without a warrant, the affirmative defense of compulsion was unavailable to him, and the prosecutor properly responded to defense counsel's remarks during closing argument.

¶ 2    Defendant Rogelio Arroyo appeals his conviction of first-degree murder after a jury trial. On appeal, defendant contends that this court should reverse his conviction and remand the matter for a new trial where 1) police officers lacked probable cause to arrest him without a warrant, 2)

the trial court erred in denying his request to present evidence supporting the affirmative defense of compulsion, and 3) during closing argument, the prosecutor improperly implicated defendant's constitutional right to a trial. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4                              A. *Pretrial Proceedings*

¶ 5      Defendant was charged with first-degree murder for the beating death of Joaquin Clara. Prior to trial, defendant filed a motion to suppress his statement in which he argued that he did not knowingly and intelligently waive his *Miranda* rights. Defendant also filed a motion to suppress identification evidence based on alleged misconduct that occurred during the administration of the photo arrays. The trial court denied both motions.

¶ 6      Defendant then filed a motion to suppress his statements and DNA evidence, alleging they were obtained through an unlawful warrantless arrest. At the hearing, the parties stipulated that defendant was arrested on August 24, 2017, at 5 p.m. They also stipulated that police did not have an arrest warrant, nor did they observe defendant committing any crime when they arrested him.

¶ 7      Detective Adam Katz testified at the hearing. He stated that on August 23, 2017, he was assigned to investigate a murder that occurred in the area of 5900 West Fullerton in Chicago. Around 9 p.m. that evening, a person identifying himself as Pedro Martinez came to the police station. Detectives later discovered that the person's name was actually Marcos Alvino. Alvino talked to Detective Salgado, who spoke Spanish.

¶ 8      Alvino stated that someone named Coco and another person named Rogelio approached him at a church a couple of blocks from the 5900 West Fullerton area. They told Alvino that Clara "was not in this world anymore" and that "he was real dead." Alvino told Detective Salgado that he believed Clara "was beat to death." Alvino gave officers the location of where Clara, who was

homeless, usually slept or spent time. Officers went to the location to verify Alvino's information. When they arrived, they observed Clara "unresponsive and deceased *** in an empty lot area."

¶ 9    Meanwhile, Detective Salgado continued speaking with Alvino at the station. Alvino described Rogelio as a Hispanic male, approximately five feet eight inches tall and weighing 160 pounds. He also had "real short hair" and was wearing a gray shirt and blue jeans. After some investigation, police found a photograph of Thomas Ocasio, whose nickname was Coco. This photograph was subsequently used in a photo array shown to Alvino on August 24, 2017, around 12:37 p.m. From the photo array, Alvino identified Ocasio as "Coco," the person who had told him about Clara. This information was relayed to Detective Katz as he investigated the case.

¶ 10    Several hours later, between 4 and 5 p.m., Detective Katz and his partner drove to the area of Fullerton and Menard to check whether surveillance video was available. There, they encountered Alvino, who was walking east on Fullerton. Alvino saw the officers and pointed at a person walking in front of him. As he did so, Alvino "was saying something to the effect of, that's him. That's Rogelio." Detective Katz identified defendant in court as the person Alvino pointed out to the officers.

¶ 11    Detective Katz approached defendant and asked his name. Defendant responded that his name was Rogelio. He also matched the description given by Alvino. The officers placed defendant under arrest.

¶ 12    On cross-examination, Detective Katz confirmed that it was Coco who told Alvino about Clara being "real dead," not Rogelio. He also acknowledged that at the time of defendant's arrest, no one "had identified Rogelio as the Rogelio who was standing next to Coco," when Coco told Alvino about Clara's death.

¶ 13 On redirect, Detective Katz stated that he had information at the time of defendant's arrest that both Coco and Rogelio approached Alvino, that "[t]hey were together." He also confirmed that "Mr. Alvino had implicated both of them with regard to their involvement in this case."

¶ 14 The trial court denied defendant's motion to suppress. It found Detective Katz's testimony credible and unimpeached by the defense. Furthermore,

"[w]hen you look at the totality of the circumstances, you look at the requirements for a – a Terry stop, where there's reasonable suspicion that a crime has been committed, is about to be committed, or will be committed, and the circumstances surrounding the knowledge that the Officers had, based on that stop, that detention and subsequent arrest, I believe there was no Fourth Amendment violation in regard to the detention and arrest of [defendant]."

¶ 15 Defendant also filed a motion to present the affirmative defense of compulsion. The trial court denied the motion, finding that defendant was only charged with first-degree murder and "the law is pretty clear thus far" that compulsion was unavailable in first-degree murder cases.

¶ 16                                        B. *Trial*

¶ 17 At trial, Rolando Vindell testified that he owned property on the 5900 block of West Fullerton, and there were two surveillance cameras on the property. After speaking with police, Vindell provided video from the evening of August 23, 2017 to August 24, 2017. He also testified that on August 23, 2017, around 9:40 to 9:55 p.m., he noticed three men walking past as he parked behind his garage. One of the men, who he identified as Coco, gave him a fist bump. Vindell did not know the other men.

¶ 18   The video was admitted and published to the jury. The video showed two men walking through the alley. Vindell identified Coco on the video as someone he knew from the neighborhood. One of the men was holding a bat.

¶ 19   Thomas Ocasio testified at defendant's trial. He stated that his nickname was Coco. He was serving 22 years in prison for murder, and he was not promised anything in exchange for his testimony. Coco knew defendant. Both he and defendant were homeless. Coco had known the victim, Clara, for over 20 years. He testified that he and defendant beat Clara on August 23, 2017, using rocks and a bat. They walked to the area where Clara slept near Fullerton. Coco carried rocks and defendant carried a bat. In beating Clara, Coco used bricks that he found "all over the place," and defendant hit Clara in the head with the bat.

¶ 20   On cross-examination, Coco stated that he was six feet five inches tall and weighed approximately 255 pounds. On the night of August 23rd, he was drinking with five or six other people. Coco pled guilty to Clara's murder and was sentenced to 22 years in prison. Otherwise, he faced a possible sentence of 60 years in prison. When he pled guilty, he answered under oath that defendant took part in Clara's beating.

¶ 21   On redirect, Coco testified that defendant killed Clara because Clara had beaten defendant and taken his chain. Defendant said that he wanted to kill Clara three days before the murder. Coco testified that defendant hit Clara over the head with the bat five times.

¶ 22   Sergeant Adam Criscione testified that he was assigned to investigate the Clara murder in August 2017. He learned that Coco and Rogelio were two people of interest. Sergeant Criscione had a description of Rogelio as a Hispanic male in his mid to late twenties, five feet six to five feet eight inches tall and weighing around 140 pounds. He was informed that Rogelio "rode around on a small black BMX-style bike in that neighborhood." When Sergeant Criscione was in the area of

5900 West Fullerton, he observed a person who matched Rogelio's description. When asked his name, the person responded, "Rogelio." He identified defendant in court as Rogelio.

¶ 23    Sergeant Criscione was present when defendant received *Miranda* warnings in Spanish. He showed defendant images from the surveillance video and defendant identified himself and Coco in the images.

¶ 24    Detective Salgado testified that his first language is Spanish, and he assisted in the case as an interpreter. After defendant was given *Miranda* warnings, he agreed to speak to police.

¶ 25    The jury viewed video clips of defendant's statement and a transcript of the statement was admitted into evidence. Defendant admitted that he was at the crime scene and that he met Coco there. He had a bat and Coco had a brick, but Coco later took the bat from him. They went to the fenced-in area where Clara slept, and Coco walked through a hole in the fence. Although Coco threatened to hurt defendant if he did not follow, defendant waited on the other side of the fence. From there, he observed Coco hit Clara on the head with a brick and the bat. Coco told him not to say anything and they left the area together. Coco threw the bat into a black garbage can.

¶ 26    The medical examiner testified that Clara died from multiple blunt force injuries. He had contusions, skin tears, scrapes and abrasions on his head and face, and the lacerations around his eye and lip were so deep that his skull was visible. The medical examiner testified that these injuries were consistent with being struck by a hard object, and such strikes could cause blood to "fly off" or "be cast onto other nearby objects."

¶ 27    The parties stipulated that buccal swabs were collected from defendant, Coco, and Clara. Furthermore, evidence technicians collected and inventoried jean shorts, socks and shoes from Coco, and a baseball cap, blue shorts, socks, white t-shirt and shoes from defendant. A baseball

bat and bricks were also recovered. Blood stains were observed on Coco's jean shorts and defendant's t-shirt. Blood was also found on the baseball bat and a brick.

¶ 28    An expert in forensic DNA analysis testified that she received standards from Coco, defendant, and Clara. She analyzed samples taken from the bat and found a mixture of two DNA profiles. Clara was identified as a possible contributor to the major DNA profile, and the expected frequency of this profile was approximately 1 in 90 octillion unrelated individuals. Clara was the single source of DNA taken from the brick. Clara also could not be excluded as a contributor to the DNA profile found in the blood stains on defendant's shirt and Coco's shorts. The expected frequency of this profile was approximately 1 in 90 octillion unrelated individuals.

¶ 29    The defense presented five photographs depicting the appearance of Coco and defendant when they were arrested.

¶ 30    In closing, the State argued that it had proven all of the elements of first-degree murder. Even taking defendant's version of the events, "just for argument's sake," the State argued that defendant was "still guilty because of this legal principle called accountability."

¶ 31    Defense counsel argued that defendant gave "honest" statements to police that matched the evidence in the case. Defendant was not part of Coco's plan to kill Clara and he did not know there would be a "fight." Defendant was intimidated by Coco, who was a "big guy." Unlike Coco, defendant's involvement in the beating was minimal. Counsel also questioned Coco's credibility and argued that he was "a special kind of witness" who "cannot be believed." Counsel reminded the jury that Coco pled guilty and received a sentence of 22 years in prison, "which when you're looking at 20 to 60, it's pretty close to the minimum." Counsel argued that Coco knew that if he told the State that defendant participated in the beating, he would get "a better deal." Furthermore,

he understood that he had to tell the same story at trial, or he would be charged with perjury. Counsel reiterated that Coco "cannot be believed."

¶ 32    In rebuttal, the State addressed defendant's credibility. The prosecutor remarked that defendant "was not completely honest when he was talking to the police." She suggested that defendant "downplay[ed]" his role in the beating because he was not "willing to totally own up to [his] involvement in a situation." Therefore, when defendant talked to police, "he decided to blame everything on Coco." The prosecutor further remarked:

> "I am not going to stand here and tell you that I think Coco is an upstanding member of society or that he's a great guy or that he should be free. Clearly, that's not the case. But I would ask you to consider his tone, his demeanor, and his physicality when you saw him in this courtroom. He pled guilty to murder. Generally speaking when people are willing to take responsibility for their actions and apologize, there's consideration in the term of years that they are sentenced to. And that's what happened with Coco.
>
> When someone is not willing to accept responsibility, you end up where we are today. But Coco was forthcoming…"

Defense counsel raised an objection, which the trial court overruled. The State continued, arguing that Coco "didn't want to be here," but he swore to tell the truth. During his testimony, Coco was calm, collected, and clearheaded. The State asked the jury to take that into consideration when assessing his credibility as a witness.

¶ 33    The jury found defendant guilty of first-degree murder. Defendant filed a motion for a new trial, alleging that the trial court erred in denying his motion to suppress statements and evidence where there was no probable cause for his arrest, and erred in denying his motion to present the

affirmative defense of compulsion. Defendant also alleged that the prosecutor made improper remarks during closing argument. The trial court denied the motion.

¶ 34    After a sentencing hearing, the trial court sentenced defendant to 25 years in prison. Defendant filed a motion to reconsider his sentence, which the trial court denied. Defendant filed this timely appeal.

¶ 35                                    III. ANALYSIS

¶ 36    Defendant first contends that the trial court erred in denying his motion to suppress his statement and evidence under the Fourth Amendment where police officers lacked probable cause to arrest him without a warrant.

¶ 37    Probable cause exists when the facts and circumstances known to officers at the time of the arrest lead a reasonable person "to believe that an offense had been committed and that the offense was committed by the person arrested." *People v. Sims*, 192 Ill. 2d 592, 615 (2000). Although mere suspicion of criminal activity is inadequate to establish probable cause, the evidence available to officers need not prove defendant's guilt beyond a reasonable doubt. *Id*. at 614-15. Rather, a probable cause determination is governed by commonsense, practical considerations instead of technical legal rules. *People v. Buss*, 187 Ill.2d 144, 204 (1999). It is an objective, case-by-case determination based on the totality of the circumstances at the time of the arrest. *People v. Jackson*, 348 Ill. App. 3d 719, 727 (2004). While we defer to the trial court's fact findings and will reverse only if those findings are against the manifest weight of the evidence, we review the court's ruling on probable cause *de novo*. *People v. Grant*, 2013 IL 112734, ¶ 12.

¶ 38    Probable cause may be established from the collective knowledge of police officers working in concert. *People v. Moore*, 378 Ill. App. 3d 41, 48 (2007). In this case, the following facts were known to police at the time of defendant's arrest. Around 9 p.m. on August 23, 2017,

Alvino came to the police station to speak with police. He informed them that Coco and Rogelio approached him a couple of blocks from the 5900 West Fullerton area. Coco told Alvino that Clara "was not in this world anymore" and that "he was real dead." Alvino believed Clara "was beat to death." Alvino's information indicated that Coco and Rogelio approached Alvino "together," and he implicated both regarding their involvement in the case. Alvino described Rogelio as a Hispanic male, approximately five feet eight inches tall and weighing 160 pounds. Rogelio also had "real short hair" and was wearing a gray shirt and blue jeans. Officers went to the location where Clara usually slept to verify Alvino's information. There, they observed Clara "unresponsive and deceased *** in an empty lot area."

¶ 39    Less than 24 hours later, while driving near 5900 West Fullerton, officers encountered Alvino. He identified defendant walking in front of him as "Rogelio." Defendant also matched the description of Rogelio given to the police. After officers confirmed defendant's name, they arrested him.

¶ 40    When, as here, a citizen provides police officers with information leading to a warrantless arrest, we examine the citizen's basis of knowledge to ensure that the information was predicated on something more than conclusory allegations or casual rumor. *Sims*, 192 Ill. 2d at 617. This examination is not a separate test in determining probable cause. *Id.* at 618. Rather, an informant's basis of knowledge is a relevant factor to consider "as part of the totality of the circumstances known to police at the time of the arrest." *Id.*

¶ 41    Alvino stated that both Coco and Rogelio approached him regarding the death of Clara. Although Alvino initially gave police a false name, he was not an anonymous informant as police soon obtained his actual name. He also had personal knowledge of defendant and the victim, and he had no motive to lie. Alvino's statements were further substantiated when officers later found

Clara deceased. Alvino's information was thus supported by some indicia of reliability. See *Sims*, 192 Ill. 2d at 619 (finding that officers could reasonably rely on an informant's statements where she had personal knowledge of the defendant and therefore, it was less likely she was reporting a casual rumor); see also *People v. Hood*, 262 Ill. App. 3d 171, 175 (1994) (finding statements that defendant committed a crime reliable where the informants personally knew the defendant, they had no motive to lie, and the police independently verified their claims that a crime had been perpetrated against the named victim).

¶ 42    Defendant argues, however, that Alvino's information provided no basis to arrest him because officers only knew that defendant was standing next to Coco when Coco spoke about Clara's death. This information did not show that Alvino had knowledge of an actual crime or that defendant was involved in criminal activity. Defendant contends that probable cause to arrest him did not arise merely because there may have been probable cause to arrest Coco.

¶ 43    As support, defendant cites *People v. Creach*, 79 Ill. 2d 96 (1980), *People v. Carnivale*, 61 Ill. 2d 57 (1975), and *People v. Galloway*, 7 Ill. 2d 527 (1956). In each of these cases, the defendant was arrested merely because he was found with the person the police intended to arrest. No one had identified the defendants in connection with the crimes for which they were arrested. See *Creach*, 79 Ill. 2d at 102-3; *Carnivale*, 61 Ill. 2d at 58; *Galloway*, 7 Ill. 2d at 535. In this case, Alvino specifically named defendant, as well as Coco, when he told police about Clara. *Creach*, *Carnivale*, and *Galloway* are factually distinguishable.

¶ 44    Defendant notes, however, that when officers encountered him on August 24, 2017, they did not observe him committing a crime or engaging in suspicious behavior. Defendant argues that the officers could have questioned him or further investigated his involvement in a possible crime,

but they had no probable cause to arrest him without a warrant. He cites *People v. Lee*, 214 Ill. 2d 476 (2005), as support.

¶ 45 In *Lee*, the police received a citizen's complaint about three men selling drugs on the corner of Second and Mississippi Streets in Joliet, Illinois. The citizen had made complaints in the past and most were "well-founded." *Id.* at 478. At that location, officers observed three men standing on the corner. A van proceeded to park on the curb and the men approached the van. They spoke to the driver and then the van drove away. The officers recognized the defendant, who had previously been arrested for drug possession, as one of the men. They recognized another as a gang member. *Id.* at 478-79. The officers did not observe an exchange of money or drugs, but based on their experience, they believed a drug transaction had taken place or was about to take place. *Id.* at 479. A protective pat-down search of the men revealed no weapons or contraband. Nonetheless, the officers arrested the men for violating Joliet's drug-loitering ordinance. *Id.*

¶ 46 On appeal to the supreme court, the defendant argued that the police lacked probable cause to arrest him without a warrant. *Id.* at 481. The court agreed, finding that "uncontradicted evidence shows that defendant stood on a street corner with two other men" and that "officers did not see a drug transaction. They merely observed three men standing on a corner and a van, which no one on the corner summoned, pull to the curb and drive away." *Id.* at 485-86. This evidence lacked an overt act constituting probable cause for an arrest. *Id.* at 486. Although the citizen's complaint justified officers approaching the defendant for questioning, further investigation was warranted. *Id*. at 487. Rather than arrest the defendant on the spot, "the officers should have waited and watched for some overt act manifesting that defendant intended to engage in drug-related activity." *Id.* at 488. The court reasoned that " '[w]hen there is a question as to whether a crime has been

committed, in addition to whether the defendant committed the crime, more evidence is required to demonstrate probable cause.' " *Id.* at 485, quoting *Buss*, 187 Ill. 2d at 205.

¶ 47    Unlike *Lee*, the officers in this case knew that a crime had been committed before they encountered and arrested defendant. Defendant emphasizes the fact that Alvino never directly implicated him in the beating of Clara, nor did Alvino witness the beating. The probable cause calculation, however, concerns only the probability of criminal activity. *People v. Hopkins*, 235 Ill. 2d 453, 477 (2009). Probable cause does not require a belief that it is "more likely true than false" that defendant has committed a crime. *Id.* "Even a tentative identification may contribute to probable cause." *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 121.

¶ 48    Probable cause exists when there is reason to believe that the defendant is involved in criminality. *People v. Adams*, 131 Ill. 2d 387, 398 (1989). Here, officers reasonably believed that a crime was committed by defendant when they arrested him. Before the arrest, Alvino told officers that he believed Clara had been beaten to death, and they subsequently found Clara deceased with evidence of blunt force trauma. They knew that Coco and Rogelio were "together" when Coco told Alvino about Clara's death. Police officers had this information when they encountered defendant, whom Alvino identified as Rogelio, less than 24 hours later near the crime scene. Defendant's location after a murder is a consideration when assessing probable cause. *Sims*, 192 Ill. 2d at 617. Defendant also matched the description of Rogelio given to police.

¶ 49    We find that the totality of the circumstances known to police at the time of defendant's arrest would lead a reasonably cautious person to believe that defendant was involved in the beating death of Clara. See *Grant*, 2013 IL 112734, ¶ 11. Accordingly, officers had probable cause to arrest him after confirming his identity. Since defendant's statements and the DNA evidence

obtained thereafter did not result from an illegal, warrantless arrest, the trial court properly denied his motion to suppress.

¶ 50    Defendant next contends that the trial court erred in denying his request to present evidence on the affirmative defense of compulsion. The court determined that compulsion was unavailable in murder cases under the present statute. In construing a statute, courts must ascertain and give effect to legislative intent. *People v. Ramirez*, 214 Ill.2d 176, 179 (2005). The best indicator of that intent is the statute's language, given its plain and ordinary meaning. *Id.* The construction of a statute is a question of law that we review *de novo*. *Id.*

¶ 51    Section 7-11(a) of the Criminal Code of 2012 (Code) provides:

> "A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct that he or she performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he or she reasonably believes death or great bodily harm will be inflicted upon him or her, or upon his or her spouse or child, if he or she does not perform that conduct." 720 ILCS 5/7-11(a) (West 2020).

Illinois abolished the death penalty for all offenses in 2011, and, as a result, first-degree murder is no longer punishable by death. See 725 ILCS 5/119-1 (West 2020). Defendant thus argues that at the time of his trial, compulsion was an affirmative defense for any charge under the plain language of section 7-11(a), and the trial court should have allowed him to present it.

¶ 52    Our supreme court construed this provision in *People v. Gleckler*, 82 Ill. 2d 145 (1980). The court noted that when the defense of compulsion was first codified in 1827, the offense of murder "was automatically punishable with death." *Id.* at 155. It found that in enacting the provision, the legislature "intended to apply the common law rule that one ought himself to die rather than escape through the murder of an innocent." *Id.* at 156.

¶ 53     The *Gleckler* court acknowledged that imposition of the death penalty for murder became discretionary in 1867. *Id.* at 155. However, the court found it significant that the phrase "other than an offense punishable with death" remained unchanged when the legislature enacted section 7-11 in 1961. It reasoned that the phrase was not "rendered meaningless by the fact that the death sentence was a discretionary punishment for all murders at the time." *Id.* at 155-56. Rather, "the meaning of section 7-11(a) *** had been settled since 1827," and the legislature's decision to make the death penalty discretionary "cannot be transformed into an intent to allow the defense of compulsion in any murder case." *Id*. at 156. The court held that "[t]he defense of compulsion, *** as a matter of legislative intent, is unavailable to one charged with murder" *Id*. at 157.

¶ 54     The supreme court recognized that its interpretation may be viewed as contrary to the plain language of the statute. Nonetheless, it had "a duty to remain faithful to the intent of the legislature regardless of the literal meaning of the statute." *Id.* at 160. The court, therefore, did not implement its holding retroactively in accordance with *Bouie v. Columbia*, 84 S. Ct. 1697, 1703 (1964) (finding that when the state judiciary construes a criminal statute in an unforeseeable manner, retroactive application of the ruling deprives a defendant of due process under the Fourteenth Amendment).

¶ 55     Defendant contends that *Gleckler* is distinguishable because when it was decided, courts still retained the discretion to impose the death penalty as a sentence for murder. However, at the time of his trial, the death penalty had been abolished. He argues that under the plain language of the statute, first-degree murder is no longer an offense punishable by death under any circumstance, and thus, compulsion is available as a defense to murder.

¶ 56     While the language of section 7-11(a) could support defendant's argument, *Gleckler* made clear that the supreme court did not rely on the literal meaning of its terms when construing the

provision. Instead, the court noted that in 1827, when the defense of compulsion was first codified, murder was "automatically punishable with death." *Gleckler*, 82 Ill. 2d at 155. The court placed significance on the legislature's intent to apply the common law rule that one should die rather than escape by murdering an innocent person. *Id* at 156. Accordingly, in using the phrase "other than an offense punishable with death," the legislature intended to exclude the offense of murder altogether, not just because murder was punishable with death. *Id.* at 157.

¶ 57    Since *Gleckler*, Illinois courts have consistently held that compulsion is not available as a defense to a murder charge. See for *e.g.*, *People v. Doss*, 214 Ill. App. 3d 1051, 1056 (1991), *People v. Edgeston*, 243 Ill. App. 3d 1, 13 (1993), *People v. Sims*, 374 Ill. App. 3d 231, 267 (2007), and *People v. Ganus*, 148 Ill. 2d 466, 472 (1992) (recognizing that the defendant, who was charged with murder, was not entitled to a compulsion defense). Even after Illinois abolished the death penalty in 2011, this court continued to hold that compulsion is not an affirmative defense to murder. See *People v. Goods*, 2016 IL App (1st) 140511, ¶ 54, and *People v. Mrdjenovich*, 2023 IL App (1st) 191699, ¶ 161.

¶ 58    Importantly, the legislature amended section 7-11 in 2010, but retained the phrase in light of established court interpretation of the provision. Courts "should construe a statute to give a reasonable meaning to all words and sentences so that no part is rendered superfluous." *People v. Glisson*, 202 Ill. 2d 499, 505 (2002). The phrase "other than an offense punishable with death" would be rendered meaningless under defendant's interpretation.

¶ 59    Additionally, "where terms used in a statute have acquired a settled meaning through judicial construction and are thereafter retained by the legislature without any correction or change, courts will presume that the legislature has chosen to acquiesce to the judicial construction placed on the terms." *People v. Simpson*, 2015 IL 116512, ¶ 30; see also *Williams v. Crickman*, 81 Ill. 2d

105, 111 (1980) (finding that "considerations of *stare decisis* weigh heavily in the area of statutory construction, especially where the legislature is free to change court interpretations of its legislation"). Until the supreme court or the legislature deems otherwise, we will follow established precedent holding that the statutory defense of compulsion is unavailable to an accused charged with first-degree murder.[1] The trial court did not err in denying defendant's request to raise the compulsion defense.

¶ 60    Defendant's final contention is that the prosecutor's remarks during closing argument improperly implicated his right to a trial. The State has considerable latitude in closing argument and "may comment on the evidence and any fair, reasonable inferences it yields." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). We review the allegedly improper remark in its entirety, as well as within the full context of the entire closing argument. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Regarding the appropriate standard of review, we acknowledge that some confusion exists and that the supreme court has, on different occasions, applied the *de novo* standard and an abuse of discretion standard. See *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39, and cases cited therein. We need not resolve the issue here, however, because our determination is the same under either standard.

¶ 61    In closing, defense counsel argued that defendant did not participate in Coco's plan to kill Clara and he was intimidated by Coco, who was a "big guy." Counsel told the jury that defendant's involvement in the beating was minimal. Counsel also questioned Coco's credibility and argued that he was "a special kind of witness" who "cannot be believed." Counsel reminded the jury that

---

[1]  Defendant notes that the State also raised the theory of accountability at trial, even though he was not charged with being accountable for Clara's murder. In any event, it would not change our determination because compulsion is not available as a defense to one charged with murder based on a theory of accountability. See *People v. Calvillo*, 170 Ill. App. 3d 1070, 1079 (1988).

Coco pled guilty and received a sentence of 22 years in prison, which was "close to the minimum." Coco knew that if he told the State that defendant participated in the beating, he would get "a better deal." Counsel reiterated that Coco "cannot be believed."

¶ 62    In rebuttal, the prosecutor first suggested that defendant was not truthful and "downplay[ed]" his role in the beating because he was not "willing to totally own up to [his] involvement in a situation." Instead, "he decided to blame everything on Coco." The prosecutor then made the comments challenged by defendant. She remarked, "when people are willing to take responsibility for their actions and apologize, there's consideration in the term of years that they are sentenced to. And that's what happened with Coco. When someone is not willing to accept responsibility, you end up where we are today. But Coco was forthcoming…" After defense counsel's objection, the prosecutor continued with the credibility issue, telling the jury that Coco "didn't want to be here," but he swore to tell the truth. The prosecutor noted Coco's calm demeanor and asked the jury to take that into consideration when assessing his credibility.

¶ 63    Viewing the comments in full, it is clear that the prosecutor was responding to defense counsel's argument attacking Coco's credibility and minimizing defendant's role in the murder. Generally, the prosecutor may respond to defense counsel's comments that clearly invite a response. *People v. Kliner*, 185 Ill. 2d 81, 154, (1998). As such, we do not find the case cited by defendant, *People v. Williams*, 2020 IL App (1st) 163417, persuasive here.

¶ 64    In *Williams*, the comments at issue were part of the State's well-orchestrated and planned argument. *Id.* ¶ 50. The prosecutor made "responsibility" the theme in the opening statement by starting with a quote from Eleanor Roosevelt and continuing with a detailed comparison of the defendant's conduct to that of M.B., who took responsibility and pleaded guilty. *Id.* ¶ 45. The prosecutor returned to this theme in closing argument, telling the jury that the defendant "has been

running from the responsibility *he should be taking* for his actions." (Emphasis in the original.) *Id.*
¶ 46. After defense counsel objected, the trial court sustained the objection and directed the prosecutor to "Move on." *Id.* However, even after receiving the instruction, the prosecutor remarked that the jury should "tell" the defendant to take responsibility for his actions. *Id.* ¶ 47. This court found that the prosecutor's pervasive comments sought to punish the defendant for not pleading guilty and "were a clear and obvious error." *Id.* ¶ 49.

¶ 65    In contrast, the prosecutor in this case did not make defendant's responsibility the "theme" of the trial, nor did the prosecutor argue that defendant should be punished for not pleading guilty. Instead, the prosecutor properly responded to defense counsel's attacks on Coco's credibility as a witness. The credibility of Coco was a key issue because his testimony that defendant beat Clara with a bat contradicted defendant's statement that his involvement was minimal. The prosecutor's comments regarding Coco being forthcoming, compared with defendant not taking responsibility and blaming everything on Coco, addressed defense counsel's argument on the issue. Generally, comments directed at the credibility of witnesses are appropriate in closing argument. *People v. Gonzalez*, 388 Ill. App. 3d 566, 593 (2008).

¶ 66    Moreover, viewed in the context of the entire closing argument, the prosecutor's comment was brief and made only in rebuttal. Where the remark was brief and isolated, it is unlikely that it deprived defendant of a fair trial. *Gonzalez*, 388 Ill. App. 3d at 590. We will find reversible error only if the comments "were so prejudicial that real justice was denied" or if the verdict resulted from the error. *People v. Runge*, 234 Ill. 2d 68, 142 (2009).

¶ 67                                 IV. CONCLUSION

¶ 68    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 69    Affirmed.